In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3377

520 SOUTH MICHIGAN AVENUE ASSOCIATES, LTD., d/b/a
THE CONGRESS PLAZA HOTEL & CONVENTION CENTER,

*Plaintiff-Appellant,*

*v.*

CATHERINE SHANNON, Director of the Illinois
Department of Labor,

*Defendant-Appellee,*

and

UNITE HERE LOCAL 1,

*Intervenor-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 4552—**Joan Humphry Lefkow**, *Judge.*

ARGUED FEBRUARY 19, 2008—DECIDED DECEMBER 15, 2008

Before MANION, KANNE, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* 520 S. Michigan Avenue Associ-
ates, Ltd., doing business as The Congress Plaza Hotel &

Convention Center ("Congress Plaza"), sued the Director of the Illinois Department of Labor ("Illinois"), seeking a declaratory judgment that Illinois statute 820 ILCS 140/3.1, the Hotel Room Attendant Amendment ("Attendant Amendment") to the One Day Rest in Seven Act, 820 ILCS 140/1 *et. seq.*, is unconstitutional. Unite Here Local 1, a labor union, intervened and together with Illinois moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The district court granted the defendant's and intervenor's motions to dismiss, rejecting Congress Plaza's arguments that the Attendant Amendment was preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, and violated its due process and equal protection rights. Congress Plaza appeals. Because the Attendant Amendment is preempted by the NLRA, we reverse.

I.

Congress Plaza is located on Michigan Avenue in Chicago, Illinois, in Cook County. Congress Plaza, employs, among others, room attendants who clean guest rooms. The Unite Here Local 1 union ("Unite Here") represents the approximately 130 room attendants working at Congress Plaza, as well as several hundred room attendants working at other Cook County hotels. As of the date of oral argument, Congress Plaza and Unite Here's latest collective bargaining agreement ("CBA") had expired on December 31, 2002. Since June 2003, Unite Here members have engaged in a work stoppage while negotiating a new CBA. Congress Plaza has continued to abide by the terms of the expired CBA, requiring a work day of eight productive hours and providing meals free of charge to its

room attendants, along with clean and sanitary facilities. Congress Plaza also customarily provides one half-hour unpaid lunch break.

In the midst of Congress Plaza's negotiations with Unite Here, the Illinois legislature passed the Hotel Room Attendant Amendment ("Attendant Amendment") to the One Day Rest in Seven Act. The One Day Rest in Seven Act was originally enacted in July 1935 and currently provides that "[e]very employer shall allow every employee except those specified in this Section at least twenty-four consecutive hours of rest in every calendar week in addition to the regular period of rest allowed at the close of each working day."[1] 820 ILCS 140/2. The One

---

[1] Under current law, Illinois exempts seven categories of employees from the mandated rest day: "(1) Part-time employees whose total work hours for one employer during a calendar week do not exceed 20; and (2) Employees needed in case of breakdown of machinery or equipment or other emergency requiring the immediate services of experienced and competent labor to prevent injury to person, damage to property, or suspension of necessary operation; and (3) Employees employed in agriculture or coal mining; and (4) Employees engaged in the occupation of canning and processing perishable agricultural products, if such employees are employed by an employer in such occupation on a seasonal basis and for not more than 20 weeks during any calendar year or 12 month period; and (5) Employees employed as watchmen or security guards; and (6) Employees who are employed in a bonafide executive, administrative, or professional capacity or in the capacity of an outside salesman, as defined in Section 12 (a)(1) of the federal Fair Labor Standards Act, as amended, and those

(continued...)

Day Rest in Seven Act further provides: "Every employer shall permit its employees who are to work for 7 ½ continuous hours or longer, except those specified in this Section, at least 20 minutes for a meal period beginning no later than 5 hours after the start of the work period."[2] 820 ILCS 140/3. The section mandating a 20-minute meal period "does not apply to employees for whom meal periods are established through the collective bargaining process." *Id.*

The Attendant Amendment to the One Day Rest in Seven Act provides, in full:

§ 3.1. Hotel room attendants.

(a) As used in this Section, "hotel room attendant" means a person who cleans or puts in order guest rooms in a hotel or other establishment licensed for transient occupancy.

---

[1] (...continued)
employed as supervisors as defined in Section 2(11) of the National Labor Relations Act, as amended; and (7) Employees who are employed as crew members of any uninspected towing vessel, as defined by Section 2101(40) of Title 46 of the United States Code, operating in any navigable waters in or along the boundaries of the State of Illinois." 820 ILCS 140/2.

[2] "This Section does not apply to employees who monitor individuals with developmental disabilities or mental illness, or both, and who, in the course of those duties, are required to be on call during an entire 8 hour work period; however, those employees shall be allowed to eat a meal during the 8 hour work period while continuing to monitor those individuals." 820 ILCS 140/3.

(b) This Section applies only to hotels and other establishments licensed for transient occupancy that are located in a county with a population greater than 3,000,000.[3]

(c) Notwithstanding any other provision of law, every hotel room attendant shall receive a minimum of two 15-minute paid rest breaks and one 30-minute meal period in each workday on which the hotel room attendant works at least 7 hours. An employer may not require any hotel room attendant to work during a break period.

(d) Every employer of hotel room attendants shall make available at all times a room on the employer's premises with adequate seating and tables for the purpose of allowing hotel room attendants to enjoy break periods in a clean and comfortable environment. The room shall have clean drinking water provided without charge.

(e) Each employer of hotel room attendants shall keep a complete and accurate record of the break periods of its hotel room attendants.

---

[3] Only one county out of the 102 counties in Illinois—Cook County—has a population of more than three million people. As of the 2000 census, Cook County's population was 5,376,741. *See* http://illinoisgis.ito.state.il.us/census2000/county_census.asp?ct=P0010001 (last visited August 15, 2008). DuPage County has the next highest population base, but as of 2000, not even one million people resided there. *Id.*

(f) An employer who violates this Section shall pay to the hotel room attendant 3 times the hotel room attendant's regular hourly rate of pay for each workday during which the required breaks were not provided.

(g) It is unlawful for any employer or an employer's agent or representative to take any action against any person in retaliation for the exercise of rights under this Section. In any civil proceeding brought under this subsection (f), if the plaintiff establishes that he or she was employed by the defendant, exercised rights under this Section, or alleged in good faith that the defendant was not complying with this Section, and was thereafter terminated, demoted, or otherwise penalized by the defendant, then a rebuttable presumption shall arise that the defendant's action was taken in retaliation for the exercise of rights established by this Section. To rebut the presumption, the defendant must prove that the sole reason for the termination, demotion, or penalty was a legitimate business reason.

(h) In addition to the remedies provided in Sections 6 and 7, a person claiming violation of this Section shall be entitled to all remedies available under law or in equity, including but not limited to damages, back pay, reinstatement, or injunctive relief. Any person terminated in violation of this Section shall recover treble his or her lost normal daily compensation and fringe benefits, together

> with interest thereon, and any consequential damages suffered by the employee. The court shall award reasonable attorney's fees and costs to a prevailing plaintiff in an enforcement action under this Section.

820 ILCS 140/3.1

After the Illinois legislature passed the Attendant Amendment and the governor signed it into law, the Illinois Hotel and Lodging Association filed a declaratory judgment action in state court against the Director of the Illinois Department of Labor, seeking to have the Attendant Amendment declared unconstitutional. The state trial court granted the Illinois Department of Labor summary judgment, concluding that the Attendant Amendment was not preempted, and that the Attendant Amendment did not violate the Illinois Constitution's prohibition on special legislation or the plaintiff's right to equal protection. *Ill. Hotel & Lodging Ass'n v. Ludwig*, No. 05CH13796, *10 (Circuit Court of Cook County, Illinois). The Illinois appellate court affirmed. *See Ill. Hotel & Lodging Ass'n v. Ludwig*, 869 N.E.2d 846 (Ill. App. Ct. 1st Dist. 2007). The Supreme Court of Illinois declined to hear the Illinois Hotel and Lodging Association's appeal. *Ill. Hotel & Lodging Ass'n v. Ludwig*, 875 N.E.2d 1111 (Ill. 2007).

While the Illinois Hotel and Lodging Association's case was making its way through the Illinois state court system, Congress Plaza, which is not a member of that trade organization, filed its own challenge to the Attendant Amendment in federal court. Congress Plaza argued that the Attendant Amendment is preempted by the National

Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, and section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Congress Plaza also alleged that the Attendant Amendment violated its due process and equal protection rights, as well as provisions of the Illinois Constitution. Congress Plaza sought a permanent injunction prohibiting enforcement of the Attendant Amendment.

Illinois and Unite Here filed separate motions to dismiss under Fed. R. Civ. P. 12(b)(6). Illinois also filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1), claiming Eleventh Amendment immunity from the state claims. The district court granted the defendants' motions to dismiss Congress Plaza's preemption and equal protection and due process claims. *520 S. Michigan Ave. Assoc., Ltd. v. Shannon*, 2007 WL 2728757 at *8-11 (N.D. Ill. 2007). The district court then declined jurisdiction over Congress Plaza's state law claims. *Id.* at *11. Congress Plaza appeals.

## II.

On appeal, Congress Plaza argues that the NLRA preempts the Attendant Amendment.[4] Whether the NLRA

---

[4] Congress Plaza does not pursue its § 301 LMRA preemption claim on appeal. Moreover, while Congress Plaza states in its Statement of the Case that it "also claims the amendment violates the special legislation provision of the Illinois Constitution and constitutes an arbitrary legislative classification," Appellant Br. at 2, it does not present these claims in its Issues

(continued...)

preempts the Attendant Amendment is a pure legal question and therefore we review the district court's decision de novo. *See Cannon v. Edgar*, 33 F.3d 880, 883 (7th Cir. 1994). Moreover, our de novo review is not limited by the state court's decision in *Ill. Hotel & Lodging Ass'n v. Ludwig*, 869 N.E.2d 846, holding that the Attendant Amendment is not preempted by the NLRA. We "owe[ ] no deference to state-court interpretation of the United States Constitution." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007) (citing *Ace Cycle World, Inc. v. Am. Honda Motor Co.*, 788 F.2d 1225, 1228 (7th Cir. 1986)).[5]

---

[4] (...continued)

Presented For Review. Congress Plaza also does not make any argument in support of its state law claims. Accordingly, Congress Plaza has waived any argument based on state law. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1025 n.6 (7th Cir. 2003) (holding that when a party presents no argument in its brief with respect to a particular claim, any arguments with respect to that claim are waived).

[5] When the question of federal preemption of state law is at issue, state and federal courts, perhaps not surprisingly, may reach starkly divergent views on the United States Constitution, as illustrated most clearly in *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). In *Geier*, the Supreme Court held that a state tort claim against Honda for failing to provide a driver's side air bag was preempted by a federal regulation. Prior to the Supreme Court's ruling, every federal circuit which considered the issue had held that the state law was preempted, while state courts uniformly held to the contrary—that federal law did not preempt state law. *Geier*, 529 U.S. at 866.

Our review of preemption begins with the Constitution's Supremacy Clause. *See Cannon*, 33 F.3d at 883. The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. Thus, under Article VI of the Constitution, federal law is the "supreme Law of the Land," and "it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT & T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (quoting *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712 (1985)).

In *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985), the Supreme Court summarized the task courts face when confronted with the issue of preemption, stating:

> In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue. Pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

*Id.* at 738 (internal quotations omitted).

As the Supreme Court recently explained in *Chambers of Commerce v. Brown*, 128 S.Ct. 2408 (2008), "the NLRA itself contains no express preemption provision." *Id.* at 2412. Thus, the issue facing us is one of implied preemption. With implied preemption, a state law should be sustained "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). Further, in the context of the NLRA, a state law is preempted by implication if it conflicts with the underlying goals and policies of the NLRA or stands "as an obstacle to the accomplishment and execution of the full purposes and objectives" of Congress. *Livadas v. Bradshaw*, 512 U.S. 107, 120 (1994) (internal quotation omitted).

From these general preemption principles, the Supreme Court has developed two relevant NLRA preemption doctrines: *Garmon* preemption and *Machinists* preemption. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959); *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976).[6] The first doctrine, *Garmon* preemption, seeks to prevent conflicts between state and

---

[6] A third preemption doctrine, based on § 301 of the LMRA, "pre-empts state law only insofar as resolution of the state-law claim requires the interpretation of a collective-bargaining agreement . . . ." *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 410 n.8 (1988). Congress Plaza argued to the district court that § 301 preempts the Attendant Amendment, but as noted above, it does not pursue that argument on appeal.

local regulation and Congress's integrated scheme of regulation embodied in Sections 7 and 8 of the NLRA. *Garmon*, 359 U.S. at 244-45. *Garmon* preemption further seeks to protect the NLRB's primary jurisdiction in cases involving sections 7 and 8 of the NLRA. *Id. See also Livadas v. Bradshaw*, 512 U.S. 107, 117, n.11 (1994).

The second relevant NLRA preemption doctrine is *Machinists* preemption. *See Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132 (1976). As the Supreme Court explained in *Metropolitan Life*, 471 U.S. 724, this "second pre-emption doctrine protects against state interference with policies implicated by the structure of the Act itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." *Id*. at 749. This preemption doctrine governs "preemption questions that arose concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act. 29 U.S.C. § 157, 158(a)(1) and (b)." *Id.* Thus, in *Machinists*, the Court held "that a State may not penalize a concerted refusal to work overtime that was neither prohibited nor protected under the NLRA, for 'Congress intended that the conduct involved be unregulated because [it] left [the conduct]' to be controlled by the free play of economic forces." *Metropolitan Life*, 471 U.S. at 750 (quoting *Machinists*, 427 U.S. at 140). While initially, *Machinists* preemption sought "to determine whether certain weapons of bargaining neither protected by § 7 nor forbidden by § 8(b) could be subject to state regulation, [i]t has been used more recently to determine the validity

of state rules of general application that affect the right to bargain or to self-organization." *Metropolitan Life*, 471 U.S. at 749 n.27 (internal citations omitted). As the Supreme Court recently explained in *Brown*, "*Machinists* preemption is based on the premise that Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Brown*, 128 S.Ct. at 2412 (internal quotations omitted). We also elaborated on the concept of *Machinists* preemption in *Cannon*, explaining that this doctrine "prohibits state and municipal regulations of areas that Congress left to the free play of economic forces." *Cannon*, 33 F.3d at 885 (internal quotations and citations omitted).

Congress Plaza argues that the Attendant Amendment is preempted by both *Machinists* preemption and *Garmon* preemption. At oral argument, though, in response to our query, Congress Plaza acknowledged that it believes *Machinists* preemption the stronger of the two arguments. We agree. *See Metropolitan Life*, 471 U.S. at 751 (considering whether a state law establishing minimal mental health benefits in insurance plans was preempted by the NLRA and stating that "[a]ll parties correctly understand this case to involve *Machinists* pre-emption"). Therefore, we begin with Congress Plaza's argument that *Machinists* preempts the Attendant Amendment.

Congress Plaza argues *Machinists* preempts the Attendant Amendment because the Attendant Amendment "intrudes on the parties' collective bargaining process" and alters the "free play of economic forces." In response,

Illinois and Unite Here (hereinafter collectively "appel-lees") argue that the Attendant Amendment is a minimum labor standard and as such is not preempted by the NLRA, citing *Metropolitan Life*, 471 U.S. 724 and *Fort Halifax*, 482 U.S.1.

In *Metropolitan Life*, 471 U.S. 724, two insurance companies ("appellants"), which issued group-health insurance policies in Massachusetts, argued that a Massachusetts statute requiring "any general health-insurance policy that provides hospital and surgical coverage, or any benefit plan that has such coverage, to provide as well a certain minimum of mental-health protection," was preempted by ERISA and the NLRA. *Id.* at 730. The appellants in *Metropolitan Life* argued that "[b]ecause welfare benefits are a mandatory subject of bargaining under the labor law, . . . the NLRA pre-empts any state attempt to impose minimum-benefit terms on the parties." *Id.* at 751-52.

The Supreme Court rejected this argument, concluding that "[t]he evil Congress was addressing [with the NLRA] . . . was entirely unrelated to local or federal regulation establishing minimum terms of employment." *Id.* at 754. Accordingly, the Court held that "[n]o incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA." *Id.* at 754-55. The Court

further expounded on the meaning of minimum state labor standards, stating they "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act." *Id.* at 755. "Most significantly," continued the Court, there was "no suggestion in the legislative history of the [NLRA] that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization." *Id.* at 756. Rather, the Court "believe[d] that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety." *Id.* The Supreme Court added:

> Federal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purpose of the federal Act. Thus the Court has recognized that it cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationship between employees, employers, and unions; obviously, much of this is left to the States. When a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act.

*Id.* at 756-57 (internal quotation omitted).

The Supreme Court then applied the aforementioned principles to the case at hand and held:

> Massachusetts' mandated-benefit law is an insurance regulation designed to implement the Commonwealth's policy on mental-health care, and as such is a valid and unexceptional exercise of the Commonwealth's police power. It was designed in part to ensure that the less wealthy residents of the Commonwealth would be provided adequate mental-health treatment should they require it. Though [the insurance statute], like many laws affecting terms of employment, potentially limits an employee's right to choose one thing by requiring that he be provided with something else, it does not limit the rights of self-organization or collective bargaining protected by the NLRA, and is not pre-empted by the Act.

*Id.* at 758. Accordingly, the Supreme Court held that Massachusetts' mandated-benefit law is not preempted by the NLRA. *Id.*

Just two years later, in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), the Supreme Court again addressed the issue of the relationship between "minimum labor standards" and preemption. In *Fort Halifax*, an employer challenged a Maine statute requiring employers to provide severance pay to certain employees. *Id.* at 5. Employees qualified if their employers laid off 100 or more employees, or relocated more than 100 miles away, so long as the employee had worked at the plant at least three years. *Id.* Severance pay was not required if the employee accepted employment at the new plant location

or if a contract with the employee addressed the issue of severance pay. *Id.* Fort Halifax argued the state law was preempted because, while it did not directly regulate economic activity, it indirectly undercut the collective bargaining process. *Id.* at 20. The Supreme Court first noted that it had rejected in *Metropolitan Life* the argument "that a State's establishment of minimum substantive labor standards undercuts collective bargaining . . . ." *Id.* at 20. The Court then explained its holding in *Metropolitan Life*, noting, among other things "that the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining." *Id.*

After the Court in *Fort Halifax* further explained *Metropolitan Life*, the Court stated that

> [i]t is true that the Maine statute gives employees something for which they otherwise might have to bargain. That is true, however, with regard to any state law that substantively regulates employment conditions. Both employers and employees come to the bargaining table with rights under state law that form a "backdrop" for their negotiations.

*Id.* at 21. The Court rejected the claim of preemption, stating "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for there is nothing in the NLRA . . . which expressly forecloses all state regulatory powers with respect to those issues . . . that may be the subject of collective bargaining." *Id.* at 21-22 (internal quotation omitted).

The Supreme Court in *Fort Halifax* concluded that the Maine statute "is not pre-empted by the NLRA, since its establishment of a minimum labor standard does not impermissibly intrude upon the collective-bargaining process." *Id.* at 23.

The Supreme Court's decisions in *Metropolitan Life* and *Fort Halifax* stand for several propositions. First, the NLRA is concerned primarily with establishing an equitable process for bargaining, and not the substantive terms of bargaining. *Fort Halifax*, 482 U.S. at 20; *Metropolitan Life*, 471 U.S. at 753-54. Second, a state law is not preempted by the NLRA merely because it regulates a mandatory subject of bargaining. *Fort Halifax*, 482 U.S. at 21; *Metropolitan Life*, 471 U.S. at 757. And third, the NLRA does not preempt a state law which "establishes a minimum labor standard that does not intrude upon the collective-bargaining process." *Fort Halifax*, 482 U.S. at 7; *see also Metropolitan Life*, 471 U.S. at 754-55 ("No incompatibility exists, therefore, because federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA.").

Against this backdrop, then, we return to the parties' arguments. As noted above, Congress Plaza claims that the Attendant Amendment is preempted by *Machinists* because it "intrudes on the parties' collective bargaining process" and alters the "free play of economic forces." In

response, based on *Metropolitan Life* and *Fort Halifax*, appellees claim that the Attendant Amendment is a minimum labor standard and is thus not preempted. Congress Plaza rejects this characterization of the Attendant Amendment (as a minimum labor standard), relying on this court's decision in *Cannon*.

In *Cannon*, a gravediggers' union, a union member, and union leaders sued the State of Illinois, claiming that the Burial Rights Act was preempted by the NLRA and therefore violated the Supremacy Clause of the Constitution. *Cannon*, 33 F.3d at 881. The Burial Rights Act required cemeteries' management and labor unions to agree to establish a pool of workers who would provide religiously required interments during a labor dispute. *Id.* at 882. Additionally, the Burial Rights Act provided that "[t]he failure of a cemetery authority or a labor union to negotiate in good faith to establish a pool of workers as provided [in the Act] constitutes a willful violation of this Section," in which case the court shall "grant appropriate relief, including . . . an award of attorney's fees and the imposition of a fine not to exceed $1,000 for each interment which is found to have been delayed in violation of this Section." *Id.* at 882 n.1 (quoting 820 ILCS 135/2.1). After setting forth the governing law, this court held that the Burial Rights Act was preempted by both *Garmon* preemption and *Machinists* preemption. *Id.* at 885. We explained that "the Burial Rights Act is a direct intrusion by the state into the collective bargaining process. The Burial Rights Act purports to regulate a particular term of the bargaining process—that of a pool of workers—and, further requires the parties to actually agree on

a particular pool of workers or face sanctions at the hands of the Illinois courts." *Id.* at 884. The court in *Cannon* held "the NLRA does not tolerate this kind of invasion by a state into the collective bargaining process. . . ." *Id. Cannon* further held that the Burial Rights Act was pre-empted by *Machinists*, because it "intrude[d] on the collective bargaining process in a variety of ways; it orders the parties to negotiate as to a specific substantive condition—that of a pool of workers to perform interments during labor disputes. And, more invasive, the Burial Rights Act orders the parties to agree on a pool of workers, or face sanctions for a failure to do so." *Id.* at 885.

Appellees argue in response that *Cannon* is distinguishable because the statute at issue in *Cannon*, the Burial Rights Act, required the parties to bargain collectively over the issue of a pool of workers, whereas the Attendant Amendment does not mandate bargaining, but instead establishes a minimum labor standard which does not interfere with the collective bargaining process. However, this is a distinction without a difference. As the Supreme Court recently explained, "[i]n NLRA pre-emption cases, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." *Brown*, 128 S.Ct. at 2414 (internal quotations omitted). What a state cannot do directly, it also cannot do indirectly. *Id.* at 2415.

The question then is whether the Attendant Amendment establishes a minimum labor standard that does not interfere with collective bargaining. If so, then the regula-

tion (direct or indirect) is permissible. To address whether the Attendant Amendment establishes a minimum labor standard, we turn again to the Supreme Court. Unfortunately, though, the Supreme Court's guidance is sparse. In *Metropolitan Life*, the Court merely noted that minimum labor standards "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." 471 U.S. at 755. The Court added that minimum labor standards have only "the most indirect effect on the right of self-organization established in the Act . . . [and] are not laws designed to encourage or discourage employees in the promotion of their interests collectively . . . ." *Id.* (quoting *Barrentine*, 450 U.S. at 739 (emphasis in the original)).

While the Attendant Amendment facially affects union and nonunion employees equally, for several reasons we conclude that it does not constitute a genuine minimum labor standard. First, unlike the statutes at issue in *Metropolitan Life* and *Fort Halifax*, the Attendant Amendment is not a statute of general application. In *Metropolitan Life*, the state law at issue did not regulate employment, but rather regulated insurance policies and it applied to all "general health-insurance polic[ies]" and "any benefit plans." *Metropolitan Life,* 471 U.S. at 730. Significantly, in *Metropolitan Life*, the Court characterized the law as one of general application, stating: "Congress apparently did not consider the question of whether state laws of *general application* affecting terms of collective-bargaining agreements subject to mandatory bargaining were to be preempted." *Id.* at 753 (emphasis added). *See also Livadas*, 512

U.S. at 123 n.17 (stating that "Congress is understood to have legislated against a backdrop of generally applicable [state] labor standards"). In *Fort Halifax*, the state's severance statute applied to all employers who laid off 100 or more employees (or relocated 100 or more miles away). *Fort Halifax*, 482 U.S. at 5. While not universal in application (since it only applied to larger layoffs or distant relocations), the statute still had a very broad application. *See, e.g., Carpenters Local Union No. 26 v. U.S. Fidelity & Guar. Co.*, 215 F.3d 136, 145 (1st Cir. 2000) (stating, in the context of ERISA preemption, that a law of general application "applies to a sufficiently broad, sufficiently generalized universe of situations").

Other circuits likewise characterize "minimum labor standards" as laws of general application. *See Chamber of Commerce v. Bragdon*, 64 F.3d 497, 503 (9th Cir. 1995) ("This is also not the type of regulation of general application that assures that certain coverage provisions be included in all health insurance contracts, such as in *Metropolitan Life;* nor is it the type of regulation seeking to alleviate a particular hardship such as plant closings that affect the employees and the community."); *Barnes v. Stone Container Corp.*, 942 F.2d 689, 692 (9th Cir. 1991) ("The Supreme Court has upheld state statutes which, although they affect employees covered by collective bargaining agreements, are statutes of *general applicability* and do not primarily 'regulate relations between employees, their union, and their employer.'") (emphasis in original) (quoting *New York Tel. Co. v. New York State Dep't. of Labor*, 440 U.S. 519, 533 (1979)); *Hull v. Dutton*, 935 F.2d 1194, 1198 (11th Cir. 1991) (holding that Alabama's longevity pay

statute is not a "minimum labor standard" in part because the "statute applies only to its own employees and not to its citizens generally"). The Attendant Amendment, however, does not have the general applicability seen in these cases. Rather, it applies to only one occupation (room attendants), in one industry (the hotel industry), in one county (Cook county).[7] These limitations distinguish the Attendant Amendment materially from the statutes of general application considered in *Metropolitan Life* and *Fort Halifax*.

The appellees argue that minimum labor standards that apply only to particular occupations, industries or categories of employers have survived preemption challenge, citing a series of cases. *See* Appellee Br. at 20-21 citing among others, *Fort Halifax*, 482 U.S. at 5, 20 (plant closing law that applied to layoffs with 100 or more employees not preempted); *Dillingham v. Sonoma County*, 190 F.3d 1034, 1041 (9th Cir. 1999) (minimum standards that applied only to apprentices in skilled construction trades not preempted); *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 485, 490 (9th Cir. 1996) (overtime regulation applying only to miners not preempted); *Nat. Broadcasting Corp. v. Bradshaw*, 70 F.3d 69, 71-72 (9th Cir. 1995) (California regulation applying only to broadcast employees not preempted); and *Wash. Serv. Contractors Coalition v.*

---

[7] The statute by its terms applies to any county with a population of three million or more, but as noted above, out of 102 counties, only Cook county has the requisite number of residents.

*District of Columbia*, 54 F.3d 811, 819 (D.C. Cir. 1995).[8] The appellees further rely on the Ninth Circuit's decision in *Associated Builders & Contractors of So. Cal., Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004), wherein the court stated that "state substantive labor standards, including minimum wages, are not invalid simply because they apply to particular trades, professions, or job classifications rather than the entire labor market."

Unlike these cases, though, the Attendant Amendment is not just limited by trade—it is also limited by location; the Attendant Amendment is a state statute that applies only in one county in Illinois—Cook county. That fact distinguishes this case from the series of cases cited by Appellees, including *Nunn*; the Attendant Amendment is not just limited to a particular trade, profession, or job classification; it is also a state statute limited to only one of Illinois' 102 counties.

Moreover, we find the Ninth Circuit's decision in *Bragdon* better reasoned. In *Bragdon*, 64 F.3d 497, the Chamber of Commerce sued a California county and county officials, challenging an ordinance that required

---

[8] Appellees noted parenthetically that *Washington Serv. Contractors*, 54 F.3d 811, held a "local ordinance applying only to janitorial contractors not preempted." Appellee Br. at 21. Contrary to Appellees' assertion, however, the statute at issue in *Washington Serv. Contractors*, 54 F.3d 811 was not limited to janitorial contractors, but applied to persons who performed "food, janitorial, maintenance, or nonprofessional health care services." *Id.* at 814.

employers to pay "prevailing wages" to employees on private construction projects costing over $500,000. *Id.* at 498. The Ordinance stated that its purpose was "to promote safe construction, minimize the risk of accidents on industrial projects, prevent erosion of the wage scale, and alleviate the burden on the County's health and welfare services and law enforcement, caused by low-paid workers." *Id.* The "prevailing wages" were defined by the California Department of Industrial Relations, which determined the "prevailing wage" "by reference to established collective bargaining agreements within the locality." *Id.* at 498-99. More specifically, "[t]he Director uses formulas that average the wages and benefits for each craft pursuant to collective-bargaining agreements applicable in each labor market." *Id.* at 502. Under the Ordinance, construction companies were required to agree to pay the state-determined prevailing wage before the County would issue a building permit. *Id.* at 499. The Chamber of Commerce argued that the Ordinance was preempted by the NLRA. *Id.* The county responded that the prevailing wage ordinance was a "minimum labor standard" and as such was not preempted. After explaining general preemption principles, the *Machinists* doctrine, and summarizing the Supreme Court's decisions in *Metropolitan Life* and *Fort Halifax*, the Ninth Circuit held that the Ordinance establishing the prevailing wage for construction workers was preempted by *Machinists*. *Id.* at 504. In so holding, the Ninth Circuit concluded that the ordinance was "also very different from a minimum wage law, *applicable to all employees*, guaranteeing a minimum hourly rate." *Bragdon*, 64 F.3d at 502 (emphasis

added). The *Bragdon* court also stressed that the Ordinance at issue was "much more invasive . . . than the isolated statutory provisions of *general application* approved in *Metropolitan Life* and *Fort Halifax*." *Id.* The court in *Bragdon* reasoned:

> This is also not the type of regulation of general application that assures that certain coverage provisions be included in all health insurance contracts, such as in *Metropolitan Life*; nor is it the type of regulation seeking to alleviate a particular hardship such as plant closings that affect the employees and the community. This Ordinance, by contrast, sets detailed minimum wage and benefit packages, distinct for each craft involved in certain limited construction projects. This minimum varies from time-to-time as new averages are calculated. The district court noted that unlike the law upheld in *Metropolitan Life*, the Ordinance is more properly characterized as an example of an interest group deal in public-interest clothing.

*Id.* at 503 (internal quotation omitted).[9]

---

[9] While the panel in *Nunn* expressed disagreement with some aspects of its Ninth Circuit colleagues' earlier decision in *Bragdon*, *see Nunn*, 356 F.3d at 990, there were two distinguishing features in *Bragdon* that separated it from *Nunn*. As *Nunn* recognized, "Congress authorized states to establish apprenticeship standards and to regulate the conditions governing the implementation of apprenticeship programs, whether the

(continued...)

Like the *Bragdon* court, we find the lack of general application in the Attendant Amendment significant. In exempting "minimum labor standards" from the preemptive force of the NLRA, *Metropolitan Life* and *Fort Halifax* both involved laws of general application and the Supreme Court has characterized "minimum labor standards" as laws of general application. *Metropolitan Life*, 471 U.S. at 753; *Fort Halifax*, 482 U.S. at 5. The Attendant Amendment's narrow scope distinguishes it from minimum labor standards which are not subject to preemption, and places the Attendant Amendment in the "zone protected and reserved for market freedom." *Brown*, 128 S.Ct. at 2412 (quoting *Building & Constr. Trades Council v. Ass'n. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993)).

The Attendant Amendment's narrow scope of application also serves as a disincentive to collective bargaining. As the Supreme Court explained in *Metropolitan Life,* a minimum labor standard should "neither encourage nor discourage the collective-bargaining process that are the

[9] (...continued)

apprentices were working on public or private projects," and this "differentiates California's apprenticeship regulations from the Contra Costa County ordinance at issue in *Bragdon*." *Nunn*, 356 F.3d at 990-91. The court in *Nunn* further distinguished *Bragdon*, reasoning "[s]econd and equally important, unlike in the case of the Contra Costa County ordinance at issue in *Bragdon,* here contractors may completely avoid the applicability of the California apprenticeship regulations" by not hiring apprentices. *Id.* at 991.

subject of the NLRA." 471 U.S. at 755. Yet by passing a statute with such a narrow focus (one occupation, in one industry, in one county), there seems to be a disincentive to collective bargaining and instead encouragement for employers or unions[10] to focus on lobbying at the state capital instead of negotiating at the bargaining table.[11]

The Ninth Circuit explained this phenomenon in *Bragdon*, 64 F.3d 497 (9th Cir. 1995). As noted above, in

---

[10] Unite Here lobbied for the Attendant Amendment. The appellees argue its lobbying is irrelevant, because "[f]ederal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalitions led to its enactment." Appellee Br. at 27 (quoting *Northern Ill. Chapter of Assoc. Builders & Contractors v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005)). We agree that Unite Here's lobbying is irrelevant, but what is relevant is that the law discourages collective bargaining.

[11] The legislative debate shows that several state legislators recognized this incentive. *See, e.g.,* IL S. Tran. 2005 Reg. Sess. No. 44, Senator Roskam ("These folks, if they want to win fair and square, by golly go negotiate. Put it on the table and negotiate. Look one another in the eye and bargain. Say we're not going to do this job unless you give us these fifteen minutes or twenty minutes or have our smoke breaks or take a diet Coke break or whatever you want to do, but we ought not do this."); IL S. Tran. 2005 Reg. Sess. No. 45, Senator Pankau ("The main item in this particular bill is this is a bargainable issue. It has been bargained before. It has been presented many times before this particular labor union. So, why are—if they can't get it in their own negotiations, why are they coming down here to us to put it into law?").

*Bragdon*, the Ninth Circuit struck an Ordinance estab-
lishing a prevailing wage for certain private construction
projects. *Id.* at 498. In striking the Ordinance, the Ninth
Circuit noted that the same or similar justifications for
the exercise of police power in one business or industry
"could be advanced for most any business or industry." *Id.*
at 504. The Ninth Circuit recognized the impact, stating:

> A precedent allowing this interference with the free
> play of economic forces could be easily applied to
> other businesses or industries in establishing
> particular minimum wage and benefit packages.
> This could redirect efforts of employees not to
> bargain with employers, but instead, to seek to set
> minimum wage and benefit packages with political
> bodies. This could invoke defensive action by em-
> ployers seeking to obtain caps on wages in various
> businesses or industries. This could be justified as an
> exercise of police power on community welfare
> grounds of lowering construction costs to attract
> business to the area or lowering costs to consumers
> so as to make products or services more available to
> the general public. This substitutes the free-play of
> political forces for the free play of economic forces
> that was intended by the NLRA.

*Id.* at 504.

Additionally, while on its face this law applies to union
and non-union employees equally, the statute's narrow
application equates more to a benefit for a bargaining unit
than an individual protection. While not all room atten-
dants in Cook county are unionized, by regulating only one

county the state makes it possible to target union-heavy counties (or union-light counties), and thus reward (or punish) union activity. Illinois' approach further allows non-union employees to benefit from the bargaining of the union which took place, not at the bargaining table, but at the legislature. In *Bragdon*, the Ninth Circuit held that *Machinists* preempted an Ordinance which "targets particular workers in a particular industry and is developed and revised from the bargaining of others, affects the bargaining process in a way that is incompatible with the general goals of the NLRA." *Bragdon*, 64 F.3d at 504.

The One Day Rest in Seven Act further shows that the Attendant Amendment is not a true minimum labor standard. As noted above, prior to passage of the Attendant Amendment, the One Day Rest in Seven Act already established a minimum labor standard for breaks, requiring employers to provide one unpaid twenty-minute meal break, although this mandate did "not apply to employees for whom meal periods are established through the collective bargaining process." 820 ILCS 140/3. That minimum labor standard still applies in Illinois, but the Attendant Amendment sets a higher standard. Illinois argues that there is no reason that it cannot increase the minimum, but that is not what Illinois did. Rather, Illinois retained its minimum labor standard and crafted a higher standard for a specific occupation, in a specific industry, in a specific county. In explaining minimum labor standards, the Supreme Court spoke of the laws as establishing a "backdrop" for their negotiations. *Fort Halifax*, 482 U.S. at 21. The One Day Rest in Seven Act established such a state-wide backdrop, while the Atten-

dant Amendment overrode the local bargaining process by imposing confining requirements on one occupation, in one industry, in one county.

Moreover, the One Day Rest in Seven Act exempts from coverage employees covered by a collective bargaining agreement that provides for break rooms and meal breaks. The Attendant Amendment does not contain a similar exemption. As the Supreme Court explained in *Fort Halifax*, "[t]he fact that the parties are free to devise their own severance pay arrangements . . . strengthens the case that the statute works no intrusion on collective bargaining [because the State] has sought to balance the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment." *Fort Halifax*, 482 U.S. at 22. While a "statute that permits *no* collective bargaining on a subject [may] escape NLRA preemption," *id.*, when the parties are not free to devise their own arrangement preemption applies because the statute intrudes on the collective bargaining process. That is especially true where a similar statute of general applicability allows for such bargaining, but the narrowly targeted law does not.

Furthermore, the Attendant Amendment does not qualify as a "minimum" labor standard. "Minimum," as used by the Supreme Court, implies a low threshold. In fact, in *Metropolitan Life*, the Supreme Court spoke of a state or federal legislation that imposes "minimal substantive requirements on contract terms negotiated between parties to labor agreements." 471 U.S. at 754. The Supreme Court also spoke of minimum labor standards

as forming the backdrop for negotiations, *Fort Halifax*, 482 U.S. at 21, again indicating a low-threshold law which serves as a floor. Our sister circuits have likewise read "minimum labor standard" as a minimal substantive impact on contracts. *See Bragdon*, 64 F.3d at 500 (stating that "[w]hen a state law establishes a minimal employment standard *not inconsistent with the general legislative goals of the NLRA,* it conflicts with none of the purposes of the Act") (emphasis in original); *Hull*, 935 F.2d at 1198 (noting that "[a]lthough the Supreme Court did not define what it considered to be a 'minimum labor standard,'" such statutes are "valid and unexceptional exercise[s] of the [state's] police power," and a state "longevity pay statute is not such a beast") (internal quotation omitted). The Attendant Amendment is much more than a mere backdrop to negotiations because it establishes terms of employment that would be very difficult for any union to bargain for. Specifically, in addition to the requirement for two paid fifteen-minute breaks and an unpaid thirty-minute lunch break, the Attendant Amendment creates a presumption of retaliation and shifts the burden of *proof* to the employer.[12] *See*

---

[12] Specifically, 820 ILCS 140/31.(g) provides: "It is unlawful for any employer or an employer's agent or representative to take any action against any person in retaliation for the exercise of rights under this Section. In any civil proceeding brought under this subsection (f), if the plaintiff establishes that he or she was employed by the defendant, exercised rights under this Section, or alleged in good faith that the defendant was not

(continued...)

820 ILCS 140/3.1. We are aware of no law or contract that establishes such a shifting of the burden of proof, nor which requires proof from the employer that the *"sole reason," id.,* for any disciplinary conduct was a legitimate business reason. Moreover, this presumption and the shifting of the burden of proof applies indefinitely; it does not matter how long ago it was that an employee exercised rights under the Attendant Amendment or alleged the employer was not complying with the terms of the Attendant Amendment. Once either occurs the defendant-employer will from then on have the burden of proof.[13]

---

[12] (...continued)

complying with this Section, and was thereafter terminated, demoted, or otherwise penalized by the defendant, then a rebuttable presumption shall arise that the defendant's action was taken in retaliation for the exercise of rights established by this Section. To rebut the presumption, the defendant must prove that the sole reason for the termination, demotion, or penalty was a legitimate business reason." Thus, for instance, if a hotel fired a room attendant because the room attendant failed to clean the required daily quota of rooms, but the room attendant alleged that the real reason for his or her termination was that he or she had taken the statutorily mandated breaks, 820 ILCS 140/3.1(g) creates a presumption of retaliation. The burden of proof would then shift to the hotel to prove that the sole reason for the termination was "a legitimate business reason."

[13] At oral argument, Unite Here's attorney stated that the presumption only applies if the employee is disciplined within

(continued...)

In addition to shifting the burden of proof to the employer, the Attendant Amendment provides that, along with back pay and reinstatement, an employee terminated in violation of the Attendant Amendment "shall recover treble his or her lost normal daily compensation and fringe benefits, together with interest thereon, and any consequential damages suffered by the employee." The Attendant Amendment further mandates the payment of costs and attorney's fees. 820 ILCS 140/3.1(h). These statutory provisions can in no sense be considered "minimal." *Cf. Brown*, 128 S.Ct. at 2410-12, 2416, 2422 (holding that California statute which prohibited employers that received state funds from using the funds "to assist, promote, or deter union organizing," was preempted by *Machinists*, because the "formidable enforcement scheme," including recovery of treble damages, attorney's fees, and costs, "put considerable pressure on an employer either to forgo his free speech right to communicate his views to his employees, or else to refuse the receipt of any state funds") (internal quotation omitted). This is especially true when considered in light of what Illinois considered an appropriate minimum for

---

[13] (...continued)

ninety days of asserting that his employer is not complying with the terms of the Attendant Amendment. However, following oral argument, Unite Here's attorney submitted a letter to correct this misstatement, confirming that the Attendment Amendment in fact does not contain any time limitation on the presumption of retaliation, as Congress Plaza's attorney had maintained during oral argument.

employers in the remaining 101 counties in the One Day Rest in Seven Act—one unpaid twenty-minute break and no shifting of the burden of proof.

In response, Illinois argues that "minimum" does not imply a low threshold, but merely is whatever "minimum" the State decides is appropriate. This argument clashes with the Supreme Court's terminology, i.e., "*minimal* substantive requirements on contract terms negotiated between parties to labor agreements." *Metropolitan Life*, 471 U.S. at 754-55 (emphasis added). This argument also cannot prevail in the circumstances of this case where Illinois had adopted one truly minimal requirement of general application, but an exponentially higher mandate for a specific occupation, in a specific industry, in one county.

Illinois also claims that because *Machinists* preemption is concerned with the process and not the substantive terms of the bargain, the substantive requirements of the Attendant Amendment are irrelevant. Illinois is correct that "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metropolitan Life*, 471 U.S. at 753. However, merely because a state statute establishes a substantive requirement does not mean that it automatically avoids preemption. Rather, to avoid preemption the state's minimum labor standard must not be incompatible with the goals of the NLRA. *See Metropolitan Life*, 471 U.S. at 757; *Fort Halifax*, 482 U.S. at 23.

The more stringent a state labor substantive standard, the more likely it is that the state law interferes with the bargaining process. And as a standard becomes more stringent, the state, at a certain point, effectively substitutes itself as the bargaining representative. As the Ninth Circuit explained in *Bragdon*:

> The Court has also clearly held that a state's requirement of "minimal substantive requirements" on contract terms is not such an interference with the bargaining process as to be pre-empted. There is no doubt that imposing substantive requirements does affect the bargaining process. Viewed in the extreme, the substantive requirements could be so restricted as to virtually dictate the results of the contract. The objective of allowing the bargaining process "to be controlled by the free-play of economic forces" can be frustrated by the imposition of substantive requirements, as well as by the interference with the use of economic weapons. The question then becomes the extent of the substantive requirements that a state may impose on the bargaining process.

*Bragdon*, 64 F.3d at 501.

In *Bragdon*, the Ninth Circuit concluded that "the Ordinance [establishing a prevailing wage] affects the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax*." *Id.* at 502. The court explained that the Ordinance is

> also very different from a minimum wage law, applicable to all employees, guarantying a minimum hourly

> rate. This Ordinance provides for specific minimum wages and benefits to be paid to each craft and only to those workers who are engaged in the specific construction projects covered by the Ordinance. This is not a wage and benefit package that has been bargained for in any fashion by these construction employers and employees, but rather is a minimum wage and benefit package that is promulgated by the Director of the Department of Industrial Relations of the State of California and that is developed by averaging the bargains struck by other employers and employees.

*Id.* at 502-03.

Like the Ordinance at issue in *Bragdon*, the Attendant Amendment "affects the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax*." *Id.* at 502. As noted above, the Attendant Amendment creates a presumption of retaliation that shifts not the burden of production, but the *burden of proof*. This shifting of the burden of proof applies indefinitely once an employee has either exercised rights under the Attendant Amendment or alleged in good faith that the employer is not complying with the terms of the Attendant Amendment. This stringent measure impacts the ability of an employer to discipline or fire employees, pursuant to the terms of a collective bargaining agreement. Under Congress Plaza's previous CBA, claims of breaches had to proceed through a carefully crafted grievance procedure and if not resolved,

required the parties to submit to arbitration. (CBA at 30-32). By creating a private cause of action for retaliation which shifts the burden of proof to the employer indefinitely, the Attendant Amendment further "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the NLRA. *Livadas*, 512 U.S. at 120 (quoting *Brown v. Hotel Employees*, 468 U.S. 491, 501 (1984)). The NLRA's purposes, as stated in the "Findings and Declaration of Policy" in § 1 of the NLRA, 29 U.S.C. § 151, include, among other things, "encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions . . . ." The Attendant Amendment does the exact opposite, encouraging litigation rather than resolution through the mechanism established by the CBA.

Moreover, room attendants are typically paid on an hourly basis, but are required to complete a certain number of rooms within that time. *See Ill. Hotel & Lodging Ass'n v. Ludwig*, 869 N.E.2d at 846, 849 (Ill. App. 2007) ("Hotel room attendants essentially work on a piece-rate system. Both union and nonunion hotels require room attendants to clean a quota of rooms each work shift. Although they are paid by the hour, room attendants are required to deliver a quantified amount of work during their shift and can be disciplined if they fail to do so.").[14]

---

[14] A court may "take judicial notice of historical documents, documents contained in the public record, and reports of

(continued...)

The Illinois legislature used this as a basis to support the Attendant Amendment, noting during the committee hearings that the quota system impacted "all hotel room attendants' ability to take breaks." *Ill. Hotel & Lodging Ass'n v. Ludwig*, No. 05CH13796, *10 (Circuit Court of Cook County, Illinois 2006) (citing *Hearings on H.B. 3485 Before the House Labor Committee*). Given the pay and work structure of room attendants, mandating breaks affects the structure of the entirety of the employment agreement. To illustrate: Assume that Congress Plaza requires room attendants to clean and service eighteen rooms during each shift. Congress Plaza customarily provided room attendants one unpaid thirty-minute lunch break. Adding another thirty minutes of break-time is likely to prevent room attendants from completing the required eighteen-room quota. After all, if Congress Plaza believed that the average room attendant could clean or service eighteen rooms in less time, it would increase the number of rooms required to be cleaned or decrease the shift time. Thus, the Attendant Amendment's mandated breaks not only increase break times, but interfere with

---

[14] (...continued)

administrative bodies . . . ." *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). Thus, we may take judicial notice of the state court decisions. *In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006) ("We begin with the New York cases; we take judicial notice of these dockets and opinions."). Moreover, this court may "consider judicially noticed documents without converting a motion to dismiss into a motion for summary judgment." *Menominee Indian*, 161 F.3d at 456.

the entire quota structure of Congress Plaza's CBA.[15] In fact, it appears from the hearings of the House Labor Committee that the legislature intended to alter the structure of the employment relationship between hotels, like Congress Plaza, and their employees. *See Ill. Hotel & Lodging Ass'n v. Ludwig*, No. 05CH13796 at *10 (Circuit Court of Cook County, Illinois 2006) ("Rather, the concerns expressed by the Legislature focused generally on all hotel room attendants' ability to take breaks in an industry where each individual must clean a quota of rooms per day.") (citing *Hearings on H.B. 3485 Before the House Labor Committee*). As the Supreme Court stated in *Machinists*, "[o]ur decisions . . . have made it abundantly clear that state attempts to influence the substantive terms of collective bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB. . . ." *Machinists*, 427 U.S. at 153.

The Ninth Circuit in *Bragdon* likewise found that a state law that impacted the broader labor agreement was preempted by the NLRA under *Machinists* because "it affects the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and

---

[15] This interference might be acceptable, if the Attendant Amendment was a law of general application, but because it targets the one specific industry—the very industry which has in place an efficiency standard setting minimal quotas—the Attendant Amendment becomes an interference with the collective bargaining process.

*Fort Halifax*." *Bragdon*, 64 F.3d at 502. The state law in *Bragdon*, as noted above, set a prevailing wage. The prevailing wage required a minimal amount that wages and benefits must total together, but also set the minimum amount that must be paid in wages. *Id.* As the *Bragdon* court aptly recognized, this ordinance interfered with the collective bargaining process because if the employer had agreed to a total compensation package that exceeded the Ordinance's requirements, but had a wage component lower than that set by the Ordinance, "[t]his would place considerable pressure on the contractor and its employees to revise the labor agreement to reduce the benefit package and increase the hourly wages in order to remain competitive and obtain the contracts and jobs . . . ." *Id.* Likewise, in *Bechtel Construction, Inc. v. United Brotherhood of Carpenters & Joiners of America*, 812 F.2d 1220 (9th Cir. 1987), the Ninth Circuit held that a state law establishing a minimum wage scale for apprentices was not a minimum labor standard, in part because "a set wage for apprentices would have required higher pay for all levels in the trade, in order to maintain the graded wage scale." *Id.* at 1126. Thus, "[t]he right to bargain collectively of one group or another is harmed by the minimum wage for apprentices." The Ninth Circuit further explained that "[u]nlike the minimum benefit standards in *Metropolitan*, the California requirements do not affect all workers equally, but concern only apprentices." *Id.* In turn, "[t]his accounts for the distorting effect that enforcement of the [wage] Standards could have on the bargaining process." *Id.* Similarly, in this case, the Attendant Amendment affects not just break periods, but

interferes with both the dispute-resolution structure of the employment relationship and with the structure of the quota system. This interference further disqualifies the Attendant Amendment from being a minimum labor standard.

In sum, for numerous reasons, we conclude that the Attendant Amendment is not a minimum labor standard and is preempted by the NLRA. First, the Attendant Amendment is not a law of general application. Rather, the Attendant Amendment applies to one occupation, in one industry, in one county. This limited scope of the Attendant Amendment discourages collective bargaining by encouraging lobbying for targeted legislation applicable to the equivalent of a bargaining unit. The Attendant Amendment is further not a true "minimum" labor standard, as demonstrated when the statute's provisions are juxtaposed against the minimal standard of general application currently in effect in Illinois, i.e., one unpaid twenty-minute break, and when considered in light of the formidable enforcement mechanism, including the treble damages and unprecedented shifting of the burden of proof to the employer. The Attendant Amendment further interferes with the objectives of the NLRA by overriding the dispute resolution mechanisms already in place and by interfering with the pay and quota structure established for room attendants. For all of these reasons,[16] we conclude the Attendant Amendment is

---

[16] Congress Plaza also argues that the Attendant Amendment is preempted because it "unilaterally alters the parties' collective

(continued...)

preempted by the *Machinists* doctrine. *See Bragdon*, 64 F.3d at 504 ("Furthermore, this type of minimum labor standard enactment, which is not of general application, but targets particular workers in a particular industry and is developed and revised from the bargaining of others, affects the bargaining process in a way that is incompatible with the general goals of the NLRA."). Because the Attendant Amendment is preempted by the *Machinists* doctrine, we need not determine whether *Garmon* preemption would also apply. Likewise, we need not decide whether the Attendant Amendment violates Congress Plaza's equal protection and due process rights. Accordingly, we reverse the judgment of the district court and remand this case to the district court for proceedings consistent with our ruling.

---

[16] (...continued)

bargaining agreement terms and conditions." Appellant Reply Br. at 1. Congress Plaza believes that a state law which forces Congress Plaza to unilaterally change the terms and conditions of employment during a labor dispute violates federal law because, prior to impasse, the NLRA requires employers to "continue to apply the terms of the expired bargaining agreement." Appellant Reply Br. at 3. We disagree. Had the Attendant Amendment truly represented a minimum labor standard that did not interfere with the collective bargaining process, the fact that the State law mandates different terms and conditions than those contained in an expired CBA would be irrelevant.

### III.

For the reasons stated above, we conclude that the Attendment Amendment is preempted by the NLRA under the *Machinists* doctrine. We REVERSE and REMAND for proceedings consistent with this opinion.