OPINION OF THE COURT
Carol R. Edmead, J.
In this class action suit alleging, inter alia, violations of the Labor Law, defendant Chinese-American Planning Council Home Attendant Program, Inc. moves pursuant to CPLR 3211 (a) (1), (5) and (7) to dismiss plaintiffs’ complaint or, in the alternative, to compel arbitration pursuant to CPLR 7503 (a).
Plaintiffs (or class members) are current and former employees of defendant, a not-for-profit corporation that provides home health care services to elderly and disabled residents of New York City.[1] Plaintiffs assert claims against defendant for unpaid minimum wages under Labor Law § 652 and 12 NYCRR 142-3.1 (count 1), unpaid overtime wages under Labor Law § 650 and 12 NYCRR 142-3.2 (count 2), unpaid spread of hours wages under Labor Law § 650 and 12 NYCRR 142-3.4 (count 3), wages due and attorneys’ fees, costs, and interest under Labor Law § 653 (count 4), and failure to comply with proper notification requirements set forth in Labor Law §§ 195 and 661, and 12 NYCRR 142-3.8 (count 5). Plaintiffs also assert a third-party beneficiary claim for breach of contract (count 6) and unjust enrichment (count 7) for failing to properly pay plaintiffs pursuant to Public Health Law § 3614-c, also known as the Home Care Worker Wage Parity Act (Wage Parity Act), and New York City’s Fair Wages for New Yorkers Act, also known as the Living Wage Law (Fair Wages Act), as required under defendant’s various contracts with government agencies.
A motion to dismiss pursuant to CPLR 3211 (a) (1) on the basis of a defense founded upon documentary evidence may be *204 granted “only where the documentary evidence utterly refutes [the complaint’s] factual allegations, conclusively establishing a defense as a matter of law” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]; Mill Fin., LLC v Gillett, 122 AD3d 98 [1st Dept 2014]). “[D]ismissal pursuant to CPLR 3211 (a) (1) is warranted only if the documentary evidence submitted . . . conclusively establishes a defense to the asserted claims as a matter of law” (Mill Fin., LLC v Gillett, 122 AD3d at 103; Art & Fashion Group Corp. v Cyclops Prod., Inc., 120 AD3d 436 [1st Dept 2014]).
When considering a motion to dismiss pursuant to CPLR 3211 (a) (7) for failure to state a cause of action, the pleadings must be liberally construed (see CPLR 3026; Siegmund Strauss, Inc. v East 149th Realty Corp., 104 AD3d 401 [1st Dept 2013]) and the court must “accept the facts alleged in the pleading as true,” accord plaintiffs “the benefit of every possible favorable inference,” and “determine only whether the facts as alleged fit within any cognizable legal theory” (Siegmund Strauss, Inc. v East 149th Realty Corp., 104 AD3d at 403 [internal quotation marks omitted]; Nonnon v City of New York, 9 NY3d 825 [2007]; Leon v Martinez, 84 NY2d 83, 87-88 [1994]).
However, “allegations consisting of bare legal conclusions as well as factual claims flatly contradicted by documentary evidence” or evidentiary material, including affidavits, are not presumed to be true or accorded every favorable inference (David v Hack, 97 AD3d 437, 438 [1st Dept 2012]; Biondi v Beekman Hill House Apt. Corp., 257 AD2d 76, 81 [1st Dept 1999], affd 94 NY2d 659 [2000]; Kliebert v McKoan, 228 AD2d 232 [1st Dept 1996], Iv denied 89 NY2d 802 [1996]), and the criterion becomes “whether the proponent of the pleading has a cause of action, not whether he has stated one” (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]; see also Leon v Martinez, 84 NY2d 83, 88 [1994]; Ark Bryant Park Corp. v Bryant Park Restoration Corp., 285 AD2d 143, 150 [1st Dept 2001]; WFB Telecom, v NYNEX Corp., 188 AD2d 257, 259 [1st Dept 1992], Iv denied 81 NY2d 709 [1993]).
Affidavits submitted by a plaintiff may be considered for the limited purpose of remedying defects in the complaint (Dollard v WB/Stellar IP Owner, LLC, 96 AD3d 533, 533 [1st Dept 2012] [the “court may freely consider affidavits submitted by the (nonmoving party) to remedy any defects in the complaint and the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one”], citing Leon v *205 Martinez, 84 NY2d 83, 88 [1994] [internal quotation marks and citation omitted]; R.H. Sanbar Projects v Gruzen Partnership, 148 AD2d 316 [1st Dept 1989]; Rovello v Orofino Realty Co., 40 NY2d 633, 635-636 [1976]; Arrington v New York Times Co., 55 NY2d 433, 442 [1982]). Yet, as to affidavits submitted by the defendant/respondent, “[affidavits submitted by a respondent will almost never warrant dismissal under CPLR 3211 unless they ‘establish conclusively that [petitioner] has no [claim or] cause of action’ ” (Lawrence v Graubard Miller, 11 NY3d 588, 595 [2008], citing Rovello v Orofino Realty Co., 40 NY2d 633, 636 [1976]).
Defendant’s contention that plaintiffs’ claims require interpretation of a collective bargaining agreement, and thus, must be submitted to the contractual grievance process, as required by section 301 of the Labor Management Relations Act (29 USC § 185) lacks merit. Contrary to defendant’s contention, plaintiffs’ claims are not preempted by section 301.
Section 301 of the Labor Management Relations Act provides that “[s]uits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties” (29 USC § 185 [a]).
When “a state claim alleges a violation of a labor contract, the Supreme Court has held that such claim is preempted by section 301 and must instead be resolved by reference to federal law” (Vera v Saks & Co., 335 F3d 109, 114 [2d Cir 2003]). Similarly, “[w]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.” (Id.)
However, not “every suit concerning employment or tangentially involving a [collective bargaining agreement] ... is preempted by section 301” (id.).
“For example, if a state prescribes rules or establishes rights and obligations that are independent of a labor contract, actions to enforce such independent rules or rights would not be preempted by section 301. . .. Nor would a state claim be preempted if its application required mere referral to the [collective bargaining agreement] for ‘information such *206 as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled’ ” (id. at 115 [citation omitted]).
In Vera, a collective bargaining agreement (CBA) between a retailer and a union covering the retailer’s shoe salespersons detailed plaintiff’s commission compensation and the method for charging shoe returns against a salesperson’s commissions. Plaintiff filed suit alleging that the returns policy set forth in the CBA and defendant’s compliance with such policy violated the Labor Law and common law concerning commissions, wage deductions and charges against wages. The court found that the case required an interpretation of the CBA because the court had to determine whether the CBA “embodies an agreement between the parties to alter the common law rule regarding when commissions are earned” (id.). The court further held that, “[m]oreover,” plaintiff challenged “the legality of a term of the CBA, namely, the . . . returns provision” and claimed that the provision violated the Labor Law (id. at 115-116). Thus, the court held, plaintiff’s “challenge to the lawfulness of a term of the CBA will require substantial interpretation of the CBA” and held that section 301 preempted plaintiff’s claim (id. at 116).
“[T]he boundary between claims requiring interpretation of a CBA and ones that merely require such an agreement to be consulted is elusive” (Vera, 335 F3d at 115; see also e.g. Ferrara v Leticia, Inc., 2012 WL 4344164, *3, 2012 US Dist LEXIS 135684, *12 [ED NY, Sept. 21, 2012, No. 09-CV-3032 (RRMXCLP)] [same]). However, case law indicates three categories under which plaintiffs’ claims have been preempted under section 301: (1) cases in which a plaintiff alleges that defendant violated the CBA itself; (2) cases in which a plaintiff claims that a provision of the CBA itself violates state law; and (3) cases in which a CBA provision relevant to the plaintiff’s claim is ambiguous, none of which apply to the first, second, third, and fourth counts of the complaint (Kaye v Orange Regional Med. Ctr., 975 F Supp 2d 412, 423 [SD NY 2013] [citations omitted]).
Kaye is instructive. In Kaye, the court noted how one district court
“attempted to clarify this ‘elusive’ line by crafting a two-part test to determine whether a claim is preempted: ‘First, a court must analyze the “legal *207 character” of the claim and whether it is truly independent of rights under the [CBA]. The starting point in making such a determination is consideration of the elements of [plaintiff’s] stated claims’ ” (Kaye, 975 F Supp 2d at 421, quoting Levy v Verizon Info. Servs. Inc., 498 F Supp 2d 586, 596 [ED NY 2007]).
“ ‘Second, even if the right exists independently of the CBA, the court must still consider whether it is nevertheless substantially dependent on analysis of a [CBA]. If such dependence exists, the claim is preempted by § 301 . . . (Kaye, 975 F Supp 2d at 421, citing Levy [citations and internal quotation marks omitted].)
Here, plaintiffs’ complaint alleges the following:
From 2009 to the present, defendant assigned class members to work 24-hour shifts, and required them to remain in the clients’ home for the entire 24-hour period to provide services, monitor the clients’ location, and be “on call” to immediately provide services to the client as needed; all 24 hours were compensable work hours (complaint ¶¶ 28-29). Defendant had a “policy and practice of paying” class members the hourly rate “for only 12 hours of work” during such 24-hour shift, plus a flat, “per diem amount currently set at $16.95,” regardless of the number of hours actually worked or whether the class members were on call (complaint ¶¶ 30-31). Also, defendant assigned class members to work more than 40 hours per week, but had a “policy and practice” of failing to pay them overtime, as well as a “policy and practice” of failing to pay them their regular rate for all hours up to 40 in weeks they worked overtime hours (complaint ¶ 32). Defendant also had a “policy and practice” of failing to pay class members “spread of hours”[2] pay when they worked a spread of hours in excess of 10 hours a day (complaint ¶ 33).[3]
*208 The class members further allege that defendant required them to attend training sessions, but had a “policy and practice” of paying only some, and not all, of the required hours (complaint ¶ 42).
And, defendant’s pay statements given to plaintiffs failed to indicate (1) dates of work covered by the payment of wages, (2) rates and basis of pay, (3) whether they were paid by the hour, shift, day, week, salary, piece, commission or other, (4) the regular hourly rate or rates of pay, (5) the overtime rate of pay, (6) the number of hours worked, and (7) number of overtime hours worked as required by Labor Law § 195 and accompanying regulations, including 12 NYCRR 142-3.8.
Plaintiffs allege that under the Wage Parity Act, Public Health Law, and Fair Wages Act, defendant, as a home health care service agency, is required, as a condition of its contract with government agencies, to certify that they are in compliance with both Acts. However, defendant failed to comply with such acts.
The “legal character” of plaintiffs’ claims sound in violations of the Wage Parity Act, Public Health Law, and Fair Wages Act and the elements of such claims indicate that they are truly independent of rights under the CBA.
It is undisputed that article X of the CBA provides that “[e]mployees assigned as a ‘live in’ to remain in a Patient’s home for a full twenty-four hours in a day will be paid a Per Diem Rate” of $117 and that “Per Diem Rates are Paid without reference to the actual hours worked per day” (¶ 3) (emphasis added). The memorandum of agreement (MOA) modified this provision, such that as of March 1, 2014, “Employees assigned to clients designated as ‘Live-in’ cases shall be paid a minimum of twelve (12) hours per day, plus a $16.95 per diem premium” (¶ 6 [emphasis added]). Upon reading the CBA and MOA together, it appears that employees required to “remain in a Patient’s home for a full twenty-four hours in a day” will be paid for 12 hours, plus $16.95, without reference to the actual hours worked for the remaining 12 hours.
Upon reading the complaint and CBA (and MOA), the court finds that plaintiffs’ allegations (i.e., paragraphs 28-41 regarding 24-hour work days, overtime for hours worked more *209 than 40 per week, and spread of hours pay for hours worked more than 10 per day) are not substantially dependent upon analysis of the terms of the CBA or MOA. Although defendant’s payments, in part, were “currently set” pursuant to the CBA and MOA, no substantial analysis of the CBA/MOA is required to determine whether defendant’s payments complied with the Labor Law or Public Health Law. In other words, even if defendant complied with its obligations under the CBA, it is alleged that defendant failed to meet the minimum wage and overtime standards set out under state and local laws (see e.g. Severin v Project OHR, Inc., 2011 WL 3902994, 2011 US Dist LEXIS 99839 [SD NY, Sept. 2, 2011, No. 10-Civ.-9696 (DLC)]). It is also noted that the complaint’s allegations (in para 15) in support of class action treatment alleges, inter alia, that issues in this matter concern whether (1) defendant’s “policy and practice of paying” class members for only 12 hours of work when they work a 24-hour shift violates the Labor Law minimum wage law; (2) all time worked by class members during a 24-hour shift is compensable work time for purposes of the Labor Law; and (3) not paying overtime to class members for an extra hour of work for shifts exceeding 10 hours or more violates the Labor Law. However, again, the court need not interpret the provisions of the CBA to determine whether defendant’s payments violated the Wage Parity Act, Public Health Law, and Fair Wages Act. Nor does the complaint cite to the CBA or MOA (Kaye, 975 F Supp 2d at 424, citing Severin, 2011 WL 3902994, *4, 2011 US Dist LEXIS 99839, *12 [“Even if resolving a dispute under a state law claim and the (CBA) would require addressing the precisely same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is independent of the agreement for § 301 pre-emption purposes”]; Polanco v Brookdale Hosp. Med. Ctr., 819 F Supp 2d 129, 134 [ED NY 2011] [“Regardless of whether the facts alleged by plaintiffs constitute a violation of the CBA, they may also make out an independent claim under Article 19 of the Labor Law”]).
The same holds true for plaintiffs’ claims regarding unpaid wages for required training meetings. Plaintiffs allege, in support of class status, that an issue exists as to whether “Defendant’s policy and practice of not paying Plaintiffs ... for all hours during which they are required to attend training meetings violates [Labor Law] minimum wage laws.” (Complaint ¶ 15 [h].) Such claim is not substantially dependent upon an *210 interpretation or analysis of the CBA or MOA. Although, article XXII of the CBA requires defendant to pay class members “who are actively working for time spent in meeting the minimum training requirements in training programs required by the Employer.” While plaintiffs allege that defendant’s payments were pursuant to a “policy and practice” of paying them for “some but not all of the required training hours,” plaintiffs do not allege that such term of the CBA is invalid, and no analysis or interpretation of this CBA term is required.
Nor does plaintiffs’ claim concerning the inadequacy of defendant’s pay statements warrant interpretation of the CBA or MOA, and is dependent solely on the Labor Law.
Defendant concedes that plaintiffs omitted any reference to the CBA and MOA in the complaint (“Plaintiff’s complaint conspicuously omits any mention of the CBA, relying only characterizations of [defendant’s] ‘policy and practice’ regarding wages” [mem of law at 7]). However, plaintiffs are not “required to plead the CBA” in their complaint, and they are “master [s] of [their] complaint, and . . . may assert state law causes of action without reliance on the CBA” (Kaye v Orange Regional Med. Ctr., 975 F Supp 2d 412, 419 [SD NY 2013] [stating, “it is inappropriate for a court to consider a CBA in evaluating a motion to dismiss claims not dependent on the CBA and where no facts about the CBA are alleged in a plaintiff’s complaint”]).
Thus, dismissal of the complaint on the ground that plaintiffs’ claims are preempted by section 301 is denied.[4] Defendant’s request, in the alternative, that the court compel arbitration under CPLR 7503 (a) is denied.[5] Defendant’s contention that plaintiffs are covered by a separate arbitration clause requiring the submission of all state law claims to arbitration lacks merit.
“A CBA cannot preclude a lawsuit concerning individual statutory rights unless the arbitration clause in the agreement is ‘clear[ ] and unmistakable! ]’ that the parties intended to *211 arbitrate such individual claims” (Tamburino v Madison Sq. Garden, LP, 115 AD3d 217, 222-223 [1st Dept 2014], citing 14 Penn Plaza LLC v Pyett, 556 US 247, 251 [2009]).
“ ‘A “clear and unmistakable” waiver exists where one of two requirements is met: (1) if the arbitration clause contains an explicit provision whereby an employee specifically agrees to submit all causes of action arising out of his employment to arbitration; or (2) where the arbitration clause specifically references or incorporates a statute into the agreement to arbitrate disputes. Arbitration clauses that cover “any dispute concerning the interpretation, application, or claimed violation of a specific term or provision” of the collective bargaining agreement do not contain the requisite “clear and unmistakable” waiver because “the degree of generality [in the arbitration provision] falls far short of a specific agreement to submit all federal claims to arbitration” ’ ” (Tamburino v Madison Sq. Garden, LP, 115 AD3d at 223).
The MOA provisions upon which defendant relies provide that
“[t]he Parties agree that given the changes in federal and state law imposing new obligations on the Employer and exposing the Employer to a significantly increased level of litigation, it is in the interest of the Union, Employees, and the Employer to develop an expeditious and effective alternative dispute resolution procedure for the resolution of claims arising under such laws. Accordingly . . . the parties shall meet in good faith to negotiate such an alternative dispute resolution procedure. If the parties are unable to agree to such a procedure in the allotted time, the Employer may submit the dispute to Martin F. Scheinman for final and binding arbitration.” (MOA ¶ 24.)
“If a party claims that a term [of this MOA] is non-compliant [with the Wage Parity Act], the parties will immediately meet to discuss appropriate modifications to bring the MOA into compliance with the Wage Parity [Act]. In the event the parties cannot resolve their dispute, the matter shall be referred to Martin F. Scheinman for resolution through binding arbitration” (MOA ¶ 22).
“If the Employer maintains that it has insufficient funds to comply on a temporary basis with the *212 economic terms of this Memorandum of Agreement, the Employer shall immediately communicate with the Union and the parties will meet within 5 days to discuss appropriate delays in payment of certain economic terms of this Memorandum of Agreement (excluding base wages If the parties are unable to reach agreement within five days of meeting, the matter shall be referred to Martin F. Scheinman for resolution through binding arbitration.” (MOA ¶ 23.)
At the outset, paragraph 23 does not apply to the claims herein, as this paragraph concerns binding arbitration over the issue of whether the defendant has “insufficient funds to comply on a temporary basis.”
Paragraph 22 does not clearly indicate an agreement to arbitrate the claims raised in the complaint. Paragraph 22 requires binding arbitration of a claim that a term of the MOA fails to comply with the Wage Parity Act. Plaintiffs do not claim that any term of the MOA violates the Wage Parity Act, but that defendant’s payments violate such law.
Further, paragraph 24 does not constitute a “clear and unmistakable” agreement to arbitrate claims arising under federal or state law. Instead, it only obligates parties to meet in good faith to negotiate an alternative dispute resolution procedure, and merely permits defendant to submit a claim to arbitration. Such paragraph does not require plaintiffs to submit a federal or state claim to arbitration.
Contrary to defendant’s contention, the complaints’ allegations as to whether defendant is a certified home health agency, plaintiffs are home health aides, plaintiffs worked on “episodes of care,” plaintiffs are third-party beneficiaries of defendant’s contracts, and defendant paid plaintiffs the “minimum rate of home care aide total compensation,” as those terms are defined under the Wage Parity Act, are not assertions that the terms of the MOA (as opposed to defendant’s actual payments) violate the Wage Parity Act.
Therefore, defendant’s request that the court compel arbitration of the claims pursuant to the MOA in the complaint is denied.
Defendant’s contention that the New York State Department of Labor’s (NYSDOL) March 11, 2010 opinion letter (NY St Dept of Labor, Op No. RO-09-0169 [the opinion letter]), in which it interprets the NYSDOL Wage Order (12 NYCRR 142-3.1 [b]), bars counts 1, 2, 3, 4, 6 and 7 lacks merit.
*213 The opinion letter provides that
“the Department applies the same test for determining the number of hours worked by all live-in employees [whether residential employees or nonresidential employees] . . .
“live-in employees must be paid not less than for thirteen hours per twenty-four hour period provided that they are afforded at least eight hours for sleep and actually receive five hours of uninterrupted sleep, and that they are afforded three hours for meals. If an aide does not receive five hours of uninterrupted sleep, the eight-hour sleep period exclusion is not applicable and the employee must be paid for all eight hours. Similarly, if the aide is not actually afforded three work-free hours for meals, the three-hour meal period exclusion is not applicable” (NY St Dept of Labor, Op No. RO-09-0169 at 4 [Mar. 11, 2010]).
Contrary to defendant’s contention, the opinion letter does not provide a defense to plaintiffs’ claims that they are owed unpaid minimum wages, unpaid overtime, or that defendant is liable for breach of contract and unjust enrichment. Plaintiffs claim that all hours in a 24-hour shift in a client’s home are compensable work hours, that they were assigned to work 24-hour shifts in clients’ homes, and that they were only paid for 13 hours of work (plus a per diem amount of $16.95). Arguably, 12 NYCRR 142-3.1 (b) indicates that an employee who works a 24-hour shift is entitled to 24-hours pay, especially where such employee does not receive five hours of uninterrupted sleep. Further, the above portion of the section upon which defendant relies is preceded in the same section by an explanation that “on call” time is that time during which employees are required to remain at the prescribed workplace, awaiting the need for the immediate performance of their assigned duties. “Employees who are ‘on call’ are considered to be working during all hours that they are confined to the workplace including those hours in which they do not actually perform their duties” (NY St Dept of Labor, Op No. RO-09-0169 at 3 [Mar. 11, 2010]). While the complaint is silent as to whether any of the plaintiffs did not receive five hours of uninterrupted sleep, the complaint alleges that plaintiffs, although not residential employees, were assigned 24-hour shifts, and were required to remain in the client’s home “for the entire 24-hour period to provide services, to monitor the client’s location, and be ‘on call’ to im *214 mediately provide services to the client as needed” (complaint ¶ 28).
And, although 12 NYCRR 142-2.1 provides that the minimum wage shall be paid to employees for the time an employee is required to be available to work at a place, “residential employees” (i.e., those who live on the premises of their employer) “are not deemed to be working during normal sleeping hours merely because the employee is ‘on call’ for those hours.” (NY St Dept of Labor, Op No. RO-09-0169 at 4 [Mar. 11, 2010] [emphasis added].) As pointed out by plaintiffs, they allegedly maintain their own residences and do not live in the home of defendant. Thus, even though the opinion letter states that it applies the same test to all live-ins, whether residential or nonresidential employees, plaintiffs are allegedly not live-ins.
Further, “[although it is true that an agency’s interpretation of its own regulation generally is entitled to deference, courts are not required to embrace a regulatory construction that conflicts with the plain meaning of the promulgated language” (see Matter of Visiting Nurse Serv. of N.Y. Home Care v New York State Dept. of Health, 5 NY3d 499, 506 [2005] [finding that petitioner had “the right to 'notice of the overpayment and an opportunity to be heard’ on the issue of overpayment recoupment”; funds sought to be recovered by Department of Health fall within the broad definition of “overpayment” and, therefore, deference to Department of Health’s interpretation was not warranted under the circumstances]; cf. Severin v Project OHR, Inc., 2012 WL 2357410, 2012 US Dist LEXIS 85705 [SD NY, June 20, 2012, No. 10-Civ.-9696 (DLC)] [finding that interpretation of the phrase “available for work at a place prescribed by the employer” as a live-in employee who is afforded at least eight hours of sleep time and actually attains five hours of continuous sleep lacks any such present ability to perform work during those hours, did not conflict with the regulatory language]).
12 NYCRR 142-3.1 (b) provides:
“The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee. However, a residential employee—one who lives on the premises of the employer—shall not be deemed to be permitted to *215 work or required to be available for work:
“(1) during his or her normal sleeping hours solely because such employee is required to be on call during such hours; or
“(2) at any other time when he or she is free to leave the place of employment.”
While 12 NYCRR 142-3.1 (b) provides that “residential” employees do not have to be paid for sleep hours, to the degree defendant interprets the opinion letter as including in this category of employees, plaintiffs, who are noreresidential employees, who purportedly seek payment for all 24 hours, the court need not defer to such opinion letter as a basis to dismiss plaintiffs’ claims.
It is noted that one court ruled that where plaintiffs did not reside or “live” in the home of their clients, but maintained their own homes and merely served “their clients’ needs sporadically overnight, the reasoning of the 2010 DOL opinion [letter] respecting the FLSA companionship exemption does not apply. . . . [Further,] the 2010 DOL opinion [letter has been found] to be ‘ambiguous, at best’ and not conclusive of plaintiff’s claims similar to those herein” (Andryeyeva v New York Health Care, Inc., 45 Misc 3d 820, 828 [Sup Ct, Kings County 2014], citing Kodirov v Community Home Care Referral Serv., Inc., 35 Misc 3d 1221 [A], 2012 NY Slip Op 50808[U] [Sup Ct, Kings County 2012]).[6]
As such, defendants’ contention, that an employer’s good faith reliance on administrative approval is a defense to liability for paying minimum wage also lacks merit.
Thus, dismissal based on the opinion letter is denied.
Further, dismissal based on the stipulation of settlement[7] between defendant and the NYSDOL is denied. The stipulation was the result of an investigation by NYSDOL of defendant, and defendant agreed to “settle the claims for unpaid wages” for a certain period. The stipulation also provides that the *216 “[p]arties agree that this Stipulation shall serve as final settlement of this matter and that no Party shall seek or take further review, action, redress or appeal of or regarding such matter
Although the stipulation was “intended as settlement only of wages and/or wage benefits found to be due to the employees set forth in the attached . . . Sheets,” the sole parties to the stipulation were the NYSDOL and defendant. Neither the plaintiffs, nor the Union, were parties to this stipulation, and thus, the stipulation is not binding upon them (see Katzen v Twin Pines Fuel Corp., 16 AD3d 133 [1st Dept 2005]).
Thus, dismissal based on the stipulation is unwarranted.
Dismissal of plaintiffs’ claim that defendant failed to pay wages for training is denied. Defendant relies on a NYSDOL August 27, 2008 opinion letter, which addresses whether a day care center is required to pay the teachers for time spent in training, where “teachers are required to obtain 30 hours of childcare training in designated subjects every two years.” (NY St Dept of Labor, Op No. RO-08-0020 at 1 [Aug. 27, 2008].) The DOL opined that because the employees “attend State-mandated classes to maintain their certification as childcare workers,” such training is not unique to the day care center at issue, and thus, such employees need not be paid by the day care center for the period they spend in such training. (Id.) For further guidance, the DOL explained that if the day care center “had its own unique standards and procedures for child care in addition to those mandated by New York State,” which the employees were required to undertake, “the time spent in such training would be for the benefit of the employer, and the employees would have to be paid for the time spent in such training.” (Id.)
Here, defendant failed to establish that such opinion letter applies to plaintiffs herein. The complaint does not assert that the training required of them is “State-mandated.” And, plaintiffs add, in opposition, that home health aides and personal care aides themselves, are not subject to any minium, yearly training requirements (mem of law at 20). Thus, a liberal reading of the complaint indicates, at this juncture, that the training required and undertaken by plaintiffs was at the request of defendant. Thus, to the degree the complaint may be read to indicate that the training required of them was for the benefit of defendant, the August 27, 2008 opinion letter does not bar plaintiffs’ unpaid training claim. Defendant’s reliance *217 on Moreno v Future Care Health Servs., Inc. (2015 NY Slip Op 31752 [U], *6 [Sup Ct, Kings County 2015]) is misplaced, in that such decision indicates that the classes at issue were “required by the New York Department of Health regulations” and plaintiff failed to provide “proof” that they there were “entitled to some pay for attending classes pursuant to the term, of defendants’ employee handbook” so as to satisfy the numerosity requirement to obtain class action status. No such proof by plaintiffs is required at this juncture. Therefore, dismissal of the unpaid training claim is denied, at this juncture.
Defendant’s contention that the complaint fails to state a claim for unpaid spread-of-hours pay lacks merit. Section 142-3.4 requires that an employee “receive one hour’s pay at the basic minimum hourly wage rate, in addition to the minimum wage required herein for any day in which: (a) the spread of hours exceeds 10 hours; (b) there is a split shift; or (c) both situations occur.” Defendant contends that the spread of hours requirement does not apply because the requirement only applies to employees earning minimum wage, and plaintiffs concede in the complaint that they were paid more than the minimum wage. However, the case on which defendant relies, Sosnowy v A. Perri Farms, Inc. (764 F Supp 2d 457 [ED NY 2011]), states that “the spread-of-hours provision is properly limited to enhancing the compensation of those receiving only the minimum required by law.” {Id. at 474.) As plaintiffs point out, the complaint alleges that they did not receive payment for all hours worked. Thus, even assuming, as defendant suggests, that plaintiffs were paid $136.95 for each weekday 24-hour shift, in the event it is determined that plaintiffs were entitled to be paid for the entire 24-hour period, plaintiffs could not be said to have received the “minimum required by law.”
And, upon a reading of the complaint, and assuming the allegations as true, the court finds that plaintiffs adequately stated claims for damages under all counts of the complaint. While pleadings must
“consist of ‘plain and concise statements in consecutively numbered paragraphs’ (CPLR 3014) and be ‘sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense’ (CPLR 3013)” (Joffe v Rubenstein, 24 *218 AD2d 752, 752 [1st Dept 1965]), plaintiffs’ complaint contains sufficiently specific allegations to give notice of the claims at issue.
As to plaintiffs’ wage statement claim (count 5), the documentary evidence defendant submits, i.e., a paystub dated April 10, 2015 for the two-week period of March 21, 2015 through April 3, 2015 is insufficient. Such paystub does not cover the entire period for which plaintiffs sue, and fails to indicate the “rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary,” or “the number of overtime hours worked,” as required by Labor Law § 195 (3). Nor is this claim barred by the stipulation (see supra at 215).
Defendant’s claim that plaintiffs fail to state claims for breach of contract and unjust enrichment under the Wage Parity Act, because such act is preempted by the Employment Retirement Income Security Act (ERISA) (29 USC § 1001 et seq.) and the National Labor Relations Act (NLRA) (29 USC § 151 et seq.), lacks merit.
Upon reading the third-party beneficiary and unjust enrichment claims, the court finds that plaintiffs sufficiently stated facts to support these claims. Plaintiffs allege that defendant entered into contracts with government agencies to pay them wages as required by the Wage Parity Act and Fair Wages Act (complaint ¶ 73). The record indicates that defendant entered into contracts with “HRA” requiring defendant to pay plaintiffs in compliance with the Wage Parity Act. Thus, plaintiffs, as third-party beneficiaries of such contracts, state a claim for breach of contract (see Moreno v Future Care Health Servs., Inc., 43 Misc 3d 1202[A], 2014 NY Slip Op 50449[U] [Sup Ct, Kings County 2014] [plaintiffs are the third-party beneficiaries of such agreement whereby Medicaid, Medicare, or any other government agency remunerates the defendant for home health care services rendered by the plaintiffs]). “The plaintiffs need not, at this juncture, allege the particulars of the contracts that may have been breached since the plaintiffs’ wages must meet the minimum requirements of the statute enacted to protect them” (2014 NY Slip Op 50449 [U], *25). As plaintiffs’ claim that they were not paid in accordance with defendant’s contract with certain agencies, and that defendant received the benefits of the work performed by plaintiffs at their expense without paying all wages due, plaintiffs stated third-party beneficiary breach of contract and unjust enrichment claims (Lynch v Upper Crust, 294 AD2d 237 [1st Dept 2002]).
*219 The court determines that the NLRA does not preempt the Wage Parity Act.
The Wage Parity Act “sets the minimum amount of total compensation that employers must pay home care aides in order to receive Medicaid reimbursements for reimbursable care provided in New York City and Westchester, Suffolk, and Nassau Counties (the ‘surrounding Counties’)” (Concerned Home Care Providers, Inc. v Cuomo, 783 F3d 77, 80 [2d Cir 2015], citing Public Health Law § 3614-c). Such home care aides “fall into two main categories: ‘home health’ aides (‘HHAs’) and ‘personal care’ aides (‘PCAs’)” (Concerned Home Care Providers, Inc., 783 F3d at 81). To address the pay gap that existed between HHAs and PCAs,[8] the New York Legislature enacted the Wage Parity Act, which requires “employers in New York City and the surrounding Counties to pay all home care aides providing Medicaid-covered care an ‘applicable minimum rate of home care aide total compensation’ in order to receive Medicaid reimbursements for that care” (Concerned Home Care Providers, Inc., 783 F3d at 81-82).
As to preemption, in accordance with the Supremacy Clause, which invalidates and prevails over any state law that conflicts with federal law, “[f]ederal preemption of a state statute can be express or implied” (New York Bankers Assn., Inc. v City of New York, 119 F Supp 3d 158, 182, citing US Const, art VI, cl 2, and Gibbons v Ogden, 22 US 1, 211 [1824]). Federal preemption occurs expressly, where “Congress has expressly preempted state law,” or impliedly, either where “Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law,” or “where federal law conflicts with state law” (New York Bankers Assn., Inc. v City of New York, 119 F Supp 3d at 182; 520 S. Mich. Ave. Assoc., Ltd. v Shannon, 549 F3d 1119, 1125 [7th Cir 2008] [“With implied preemption, a state law should be sustained ‘unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States’ ”]). However, the doctrine of *220 preemption applies only to “regulation,” as opposed to proprietary laws (New York Bankers Assn., Inc. v City of New York, 119 F Supp 3d at 182 [“pre-emption doctrines apply only to . . . regulation”]). Thus, the court must first determine whether the Wage Parity Act is regulatory, before determining whether it conflicts with federal law.
When
“ ‘distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate . . . , the key is to focus on two questions’:
“ ‘First, does the challenged action essentially reflect the entity’s own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?’ ” (New York Bankers Assn., Inc. v City of New York, 119 F Supp 3d at 183, quoting Healthcare Assn. of N.Y. State, Inc. v Pataki, 471 F3d 87, 109 [2d Cir 2006].)
It is uncontested that the NLRA does not contain an express preemption provision (Concerned Home Care Providers, Inc.) (defendant’s mem of law at 26-27).
Further, the NLRA does not comprehensively occupy an entire field of regulation, but left room for state law to regulate the substantive labor standards by setting a baseline for employment negotiations, while retaining the ability to regulate the bargaining process (Concerned Home Care Providers, Inc. at 85 [“The statute’s concern with ‘establishing an equitable process for determining terms and conditions of employment’ does not extend to the ‘particular substantive terms of the bargain that is struck’ “states have traditionally possessed ‘broad authority under their police powers to regulate the employment relationship,’ and the substantive labor standards that they enact set a baseline for employment negotiations” (emphasis added)]). Indeed, “pre-emption should not be lightly inferred . . . , since the establishment of labor standards falls within the traditional police power of the State” (Fort Halifax Packing Co. v Coyne, 482 US 1, 21 [1987]).
*221 Nor can it be said that the Wage Parity Act conflicts with the NLRA. Instead, the “Wage Parity Law is a valid exercise of New York’s authority to set minimum labor standards” (Concerned Home Care Providers, Inc. at 85).
Defendant’s reliance on the “Machinists'” doctrine, established by the United States Supreme Court in Machinists v Wisconsin Empl. Relations Commn. (427 US 132 [1976]), and application of this doctrine by the Seventh Circuit in 520 S. Mich. Ave. Assoc., Ltd. v Shannon (549 F3d 1119 [7th Cir 2008]), is misplaced.[9] The Machinists preemption “applies to conduct the NLRA left unregulated” (Healthcare Assn. of N.Y. State v Pataki, 471 F3d at 107). Although it was initially sought “to determine whether certain weapons of bargaining neither protected by § 7 nor forbidden by § 8 (b) [of the NLRA] could be subject to state regulation, [i]t has been used more recently to determine the validity of state rules of general application that affect the right to bargain or to self-organization” (520 S. Mich. Ave. Assoc., Ltd. v Shannon, 549 F3d at 1126).
The court in 520 S. Mich. Ave. Assoc., Ltd. concluded that the statute in question, the “Attendant Amendment” to the One Day Rest in Seven Act, did not have the general applicability of typical minimum labor standard laws, but impermissibly “overrode the local bargaining process by imposing confining requirements on one occupation [hotel room attendants], in one industry [the hotel industry], in one county [Cook County],” and was thus preempted by the Machinist doctrine {id. at 1134). The pivotal question addressed by the court, however, was whether the Attendant Amendment established a minimum labor standard that did not interfere with collective bargaining. The court explained,
“by regulating only one county [Cook] the state makes it possible to target union-heavy counties (or union-light counties), and thus reward (or punish) union activity. Illinois’ approach further allow [ed] non-union employees to benefit from the bargaining of the union which took place, not at the bargaining table, but at the legislature” {id. at 1133).
*222 The court further expounded:
“prior to passage of the Attendant Amendment, the One Day Rest in Seven Act already established a minimum labor standard for breaks, requiring employers to provide one unpaid twenty-minute meal break, although this mandate did ‘not apply to employees for whom meal periods are established through the collective bargaining process.’ . . . That minimum labor standard still applies in Illinois, but the Attendant Amendment sets a higher standard. Illinois argues that there is no reason that it cannot increase the minimum, but that is not what Illinois did. Rather, Illinois retained its minimum labor standard and crafted a higher standard for a specific occupation, in a specific industry, in a specific county. In explaining minimum labor standards, the Supreme Court spoke of the laws as establishing a ‘backdrop’ for their negotiations. Fort Halifax, 482 U.S. at 21, 107 S. Ct. 2211. The One Day Rest in Seven Act established such a state-wide backdrop, while the Attendant Amendment overrode the local bargaining process by imposing confining requirements on one occupation, in one industry, in one county” (id. at 1134).
The court adopts the view taken in Concerned Home Care Providers, Inc., which distinguished 520 S. Mich, on the ground that the Attendant Amendment in 520 S. Mich, established “ ‘terms of employment that would be very difficult for any union to bargain for,’ including detailed break requirements and changes to the burden of proof and to damages calculations in retaliation lawsuits” (783 F3d at 86 n 8). Such provisions represented a “substantially more targeted invasion of the bargaining process than the Wage Parity Law’s minimum compensation requirement” (id.). By adjusting the burden of proof in retaliation cases, the Attendant Amendment “arguably interfered with both the NLRB’s jurisdiction and the parties’ grievance and arbitration procedures” and thus “went beyond prescribing minimum labor standards and arguably interfered with the collective-bargaining process” (783 F3d at 86 n 8). The Wage Parity Act does not favor or disfavor collective bargaining (see also Concerned Home Care Providers, Inc. v Cuomo, 979 F Supp 2d 288, 304 [ND NY 2013], affd 783 F3d 77 [2015] [expressly declining to follow the reasoning in 520 S. Mich., and concluding that the Wage Parity Act “avoids Machinists pre-emption because it does not affect the bargaining process *223 itself, but rather falls within the traditional police power of the state to establish labor standards”]).
As to defendant’s argument that the Wage Parity Act intrudes upon the bargaining process by encouraging the lobbying of a local (as opposed to a state) governmental body, it has been noted that while employees can lobby the city government for higher wages, “the ability to lobby is present ‘with regard to any state law that substantively regulates employment conditions’ ” and it is not “for courts to close political routes to workplace protections simply because those protections may also be the subject of collective bargaining” (Concerned Home Care Providers, Inc., 783 F3d at 87).
Further, the Wage Parity Act “may affect the package of benefits over which employers and employees can negotiate, but ‘it does not limit the rights of self-organization or collective bargaining protected by the NLRA, and is not preempted by that Act’ ... [as it does not] impermissibly intrude upon the collective-bargaining process” (Concerned Home Care Providers, Inc., 783 F3d at 86).
“Unions, individual employees, and employers therefore remain free to bargain about how to allocate total compensation between wages and other benefits and whether a compensation rate above the January 1, 2011 level is appropriate. The Wage Parity Law’s use of the largest collective bargaining agreement to set the ‘prevailing rate of total compensation’ has no more of an effect on incentives to bargain collectively, than if the Legislature wrote a rate directly into the statute.” (Id. at 87-88.)
As the court adopts the rationale in Concerned Home Care Providers, and holds that the NLRA does not preempt the Wage Parity Act (id. at 87), dismissal on the ground that the NLRA preempts plaintiffs’ breach of contract and unjust enrichment claims is unwarranted.
As to whether ERISA preempts plaintiffs’ claims, as plaintiffs concede, ERISA preempts subdivision (4) of the Wage Parity Act (see also Concerned Home Care Providers). Nevertheless, such subdivision is severable from the remaining portions of the Wage Parity Act, and case law holds that the remaining portions are not preempted by ERISA.
“The Wage Parity Law was enacted in Part H of chapter 59 of the 2011 Session Laws of New York *224 State. Section 110 of that same Part states that, if any subdivision of the act ‘shall be adjudged’ invalid, the judgment ‘shall not . . . invalidate the remainder thereof, but shall be confined in its operation to the . . . subdivision . . . directly involved’ ” (Concerned Home Care Providers at 88).
Thus, with subdivision (4) severed pursuant to “statutory command,” ERISA does not preempt the remainder of the Wage Parity Act.
“Unlike the NLRA, ERISA contains an express provision that preempts ‘any and all State laws insofar as they may now or hereafter relate to any employee benefit plan’ ” (Concerned Home Care Providers at 88, citing 29 USC § 1144 [a] [emphasis omitted]). Thus, “a state law is preempted if ‘it (1) has a connection with or (2) reference to [an ERISA] plan’ ” (id., citing Liberty Mut. Ins. Co. v Donegan, 746 F3d 497, 504 [2d Cir 2014]). However, as ERISA is designed to regulate employee welfare and pension benefit plans by “control [ling] the administration of benefits plans” through “reporting and disclosure mandates,” and does not require “employers to provide any given set of minimum benefits,” the statute does not preempt state laws that have “only an indirect economic effect on ERISA plans” (Concerned Home Care Providers at 88, citing Liberty Mut., 746 F3d at 507 [internal quotation marks omitted]).
The Second Circuit in Concerned Home Care Providers explained that the Wage Parity Act “gives employers freedom” to select the manner in which they pay the “minimum rate of home care aide total compensation” (id. at 89). Under the act, “[t]otal compensation” may consist of “wages and other direct compensation paid to or provided on behalf of the employee,” including “health, education, or pension benefits, supplements in lieu of benefits and compensated time off.” (Id., citing Public Health Law § 3614-c [1] [b].)
“The statute is agnostic as to the mix of wages and benefits that employers provide, so long as the total amount equals or exceeds the applicable minimum rate. Where, as here, ‘a legal requirement may be easily satisfied through means unconnected to ERISA plans ... it “affect[s] employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law ‘relates to’ the plan.” ’ ” (Concerned Home Care Providers at 89.)
*225 Defendant’s claim that a review of subdivision (4) is interwoven inextricably with other provisions of the Wage Parity Act such that the remainder portions of the Wage Parity Act must be deemed preempted along with subdivision (4) lacks merit.
Subdivision (4) provides:
“Any portion of the minimum rate of home care aide total compensation attributable to health benefit costs or payments in lieu of health benefits, and paid time off, as established pursuant to subdivision three of this section shall be superseded by the terms of any employer bona fide collective bargaining agreement in effect as of January first, two thousand eleven, or a successor to such agreement, which provides for home care aides’ health benefits through payments to jointly administered labor-management funds.” (Emphasis added.)
Subdivision (3) sets forth the minimum rate of home care aide total compensation in a city with a population of one million, i.e., a certain percentage of the total compensation mandated by the Living Wage Law.[10]
Furthermore, contrary to defendant’s contention, subdivisions (1) and (3) do not sufficiently “relate to” ERISA plans so as to be preempted by ERISA.
*226 Subdivision (1) provides definitions of terms used in the Wage Parity Act, and as relevant herein, defines “Total compensation” and “Prevailing rate of total compensation” as follows:
“(b) ‘Total compensation’ means all wages and other direct compensation paid to . . . the employee including, but not limited to, wages, health, education or pension benefits, supplements in lieu of benefits and compensated time off....
“(c) ‘Prevailing rate of total compensation’ means the average hourly amount of total compensation paid to all home care aides covered by whatever collectively bargained agreement covers the greatest number of home care aides in a city with a population of one million or more. For purposes of this definition, any set of collectively bargained agreements in such city with substantially the same terms and conditions relating to total compensation shall be considered as a single collectively bargained agreement.” (Emphasis added.)
Although subdivision (1) requires that home care workers be compensated pursuant to the “prevailing rate of total compensation,” if that rate is higher than New York City’s Living Wage Law, and such prevailing rate of total compensation would include benefit plans referenced in the collective bargaining agreement as described in the subdivision, the mere reference to “pension benefits” as one of the several forms of compensation is too tenuous. Indeed, a similar argument by the plaintiff in Concerned Home Care Providers, Inc. (at 88-89), that the Wage Parity Act “has a ‘connection with’ ERISA plans because employers will have to reevaluate, and possibly enhance, their benefits packages in order to pay employees the ‘applicable minimum rate of home care aide total compensation’ ” was rejected by the Second Circuit; the Second Circuit noted that the “Supreme Court and this [c]ourt have held that such an indirect effect on ERISA plans does not trigger preemption. Instead, only statutes that ‘mandate! ] employee benefit structures or their administration’ have impermissible ‘connection[s] with’ ERISA plans.” Here, there is no indication that agencies will be “forced” or “mandated” to modify or restructure their benefit plans to comply with the Wage Parity Act.
Nor is subdivision (4) critical to the regulatory scheme. Even “without subdivision four, the Wage Parity Law will still accomplish the legislative purpose of aligning home care aide compensation in the New York City metropolitan area” (Concerned Home Care Providers, Inc. at 88).
*227 As noted by Concerned Home Care Providers, Inc.,
“In order to trigger ERISA preemption, a statute must not merely mention or allude to an ERISA plan, but must also have some relationship to ERISA plans or affect ERISA plans in some manner. . . . [The Supreme] Court has reserved preemption based on ‘reference [s] to’ ERISA plans for situations where ‘a State’s law acts immediately and exclusively upon ERISA plans ... , or where the existence of ERISA plans is essential to the law’s operation’ ” (Concerned Home Care Providers, Inc. at 90).
A review of the subdivisions of the Wage Parity Act demonstrates that it does not immediately or exclusively act upon ERISA; nor is the existence of any ERISA plan essential to the operation of the Wage Parity Act.
While the preempted subdivision (4) is in part, dependent upon subdivision (3), subdivision (3) is not so dependent, and may effect the purposes of the Act without reference to subdivision (4).
“The creation of ERISA plans by SEIU 1199’s collective bargaining agreement has no more than a remote bearing on the Wage Parity Law’s operation. Employers are not required to match the benefits in SEIU 1199’s collective bargaining agreement, or to provide benefits at all. Indeed, employers need not even calculate the benefits in SEIU 1199’s plan. Instead, the Wage Parity Law requires the Commissioner of the New York State Department of Health to calculate an ‘hourly amount of total compensation’ and promulgate that rate to employers” (Concerned Home Care Providers at 90, citing Public Health Law § 3614-c [1] [c]; [8] [emphasis omitted]).
“This calculation converts all of the benefits from SEIU 1199’s collective bargaining agreement—including those contained in its ERISA plans—into a single hourly figure. It is that final rate, and not its component parts, that constitutes the ‘applicable minimum rate of home care aide total compensation.’ ” (Id.) The Wage Parity Act would operate in precisely the same way even if SEIU 1199’s collective bargaining agreement did not cover ERISA plans at all. The Wage Parity Act, then, “functions irrespective of. . . the existence of an ERISA plan.” (Id.)
Therefore, dismissal on the ground that ERISA preempts plaintiffs’ claims is denied.
*228 Conclusion
Based on the foregoing, it is hereby ordered that the motion by defendant pursuant to CPLR 3211 (a) (1), (5) and (7) to dismiss plaintiffs’ complaint or, in the alternative, to compel arbitration pursuant to CPLR 7503 (a) is denied in its entirety.

. It is undisputed that plaintiffs are represented by 1199 SEIU United Healthcare Workers East (the Union).

. “Spread of hours” is defined as the “the interval between the beginning and end of the workday.” (Bauin v Feinberg, 6 Misc 3d 1038[A], 2005 NY Slip Op 50343[U], *5 [Civ Ct, NY County 2005], citing 12 NYCRR 138-4.13.)

. Specifically as to plaintiff Lai Chan (Chan), the class members allege that she worked between three and five consecutive 24-hour shifts each week for a total of 72 to 120 hours of work per week. For weekday 24-hour shifts, Chan was only paid an hourly rate of $11.10 per hour for 12 horns of work each shift, and a flat per diem payment of $16.95 for each 24-hour shift. She received no hourly compensation for hours worked over 12 during a 24-hour shift (complaint ¶ 34). As a result of defendant’s “policies and practices,” Chan was not paid the statutorily required minimum wage for hours up to *208 40, the required overtime rate of pay for hours she worked in excess of 40 in a week, or her regular rate for all hours worked up to 40 in a week (complaint ¶ 35).

. Defendant’s contention, that plaintiffs’ claims must be submitted to the grievance process, as required by the federal Labor Management Relations Act, rests on the theory of preemption. Thus, the court rejects defendant’s claim that plaintiffs’ failure to assert compliance with the grievance process is fatal to their claims.

. Pursuant to CPLR 3211 (a) (5), a party may move for dismissal on the ground that “the cause of action may not be maintained because of arbitration and award.” Dismissal on this alternative ground is denied, for the reasons stated herein.

. The opinion letter further indicates that “[a] different opinion might result if the circumstances stated therein change, if the facts provided were not accurate, or if any other relevant fact was not provided.” (NY St Dept of Labor, Op No. RO-09-0169 at 4 [Mar. 11, 2010].) Such statement renders the opinion letter’s connection to the plaintiffs “ambiguous at best” (Melamed v Americare Certified Special Servs., Inc., 2014 NY Slip Op 33296[U], *8 [Sup Ct, Kings County 2014]).

. Defendant seeks dismissal of the claims to the extent they relate to the time period from 2009 through Dec. 27, 2013, which is the period covered by the stipulation.

. Unlike the PCAs, HHAs were required to undergo extensive training but did not benefit from the City’s Living Wage Law, as did the PCAs. By 2010, HHAs in New York City and the surrounding counties received a lower starting hourly wage than PCAs (Concerned Home Care Providers, Inc. v Cuomo).

. Although “the Supreme Court has developed two relevant NLRA preemption doctrines: Garmon preemption and Machinists preemption” (520 S. Mich. Ave. Assoc., Ltd. v Shannon at 1125), defendant cites only to the Machinists preemption.

. Subdivision (3) (a) provides as follows: (i) for the period Mar. 1, 2012 through Feb. 28, 2013, 90% of the total compensation mandated by the Living Wage Law of such city; (ii) for the period Mar. 1, 2013 through Feb. 28, 2014, 95% of the total compensation mandated by the Living Wage Law of such city; (iii) for the period after Mar. 1, 2014, the total compensation shall be “no less than the prevailing rate of total compensation as of” Jan. 1, 2011, or “the total compensation mandated by the living wage law of such city, whichever is greater.”
Subdivision (3) (b) sets forth the minimum rate of home care aide total compensation in the counties of Nassau, Suffolk and Westchester as follows: (i) for the period Mar. 1, 2013 through Feb. 28, 2014, 90% of the total compensation mandated by the Living Wage Law as set on Mar. 1, 2013 of a city with a population of a million or more; (ii) for the period Mar. 1, 2014 through Feb. 28, 2015, 95% of the total compensation mandated by the Living Wage Law as set on Mar. 1, 2014 of a city with a population of a million or more; (iii) for the period Mar. 1, 2015 through Feb. 28, 2016, 100% of the total compensation mandated by the Living Wage Law as set on Mar. 1, 2015 of a city with a population of a million or more; (iv) for all periods after Mar. 1, 2016, the lesser of (i) 115% of the total compensation mandated by the Living Wage Law as set on Mar. 1 of each succeeding year of a city with a population of one million or more; or (ii) the total compensation mandated by the Living Wage Law of Nassau, Suffolk or Westchester County, based on the location of the episode of care.